1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                           EASTERN DISTRICT OF CALIFORNIA

10

11   JOSH MEIXNER,                             No.  2:14-cv-02143-TLN-EFB

12              Plaintiff,

13        v.                                   **ORDER GRANTING IN PART AND
                                               DENYING IN PART DEFENDANTS'
14   WELLS FARGO BANK, N.A.,                   MOTION TO DISMISS**
     SUCCESSOR BY MERGER TO WELLS
15   HOME MORTGAGE, INC.; HSBC
     BANK USA, N.A., AS TRUSTEE FOR
16   GSAA HOME EQUITY TRUST 2005-7,
     and DOES 1 through 50.
17
                Defendants.
18

19              This matter is before the Court pursuant to Defendants Wells Fargo Bank, N.A.,

20   Successor by Merger to Wells Fargo Home Mortgage, Inc. ("Wells") and HSBC Bank USA,

21   N.A., as Trustee for GSAA Home Equity Trust 2005-7's ("HSBC") (collectively "Defendants")

22   Motion to Dismiss Plaintiff's Complaint.  (Def. s' Mot. to Dismiss, ECF No. 4.)  Plaintiff Josh

23   Meixner ("Plaintiff") filed an opposition to Defendants' motion.  (Pl.'s Opp'n, ECF No. 6.)  The

24   Court has carefully considered the arguments raised in Defendants' motion and reply, as well as

25   Plaintiff's opposition.  For the reasons set forth below, Defendants' Motion to Dismiss is

26   GRANTED IN PART AND DENIED IN PART.

27        **I.   FACTUAL BACKGROUND**

28              In or about January 2005, Plaintiff entered into a purchase money mortgage loan

1

with Wells for $329,855.00 which was evidenced by a Note and was secured by a Deed of Trust on the Subject Property.  (Compl., ECF No. 1-1 at 11, ¶ 13.)  In or about September 2008, Plaintiff began to have difficulty making his monthly payments.  (ECF No. 1-1 at 11, ¶ 14.) Plaintiff contacted Wells about a loan modification, and a Wells representative allegedly instructed Plaintiff to stop making loan payments in order to be considered for a Home Affordable Modification Program ("HAMP") loan modification.  (ECF No. 1-1 at 11, ¶ 14.)  In or about March 2009, Plaintiff, represented by Pro City Mortgage,[1] began the loan modification process with Wells.  (ECF No. 1-1 at 12, ¶ 15.)  On or about July 22, 2009, Wells caused to be recorded a Notice of Default with the Sacramento County recorder stating that $16,593.81 was past due on Plaintiff's loan.  (ECF No. 1-1 at 12, ¶ 16.)

In or about September 2009, Kelly Robert from Pro City Mortgage informed Plaintiff that she had spoken with Wells and that Wells had told her that Plaintiff had been approved for HAMP.  (ECF No. 1-1 at 12, ¶ 17.)  Ms. Robert further informed Plaintiff that she did not have any specific details regarding the loan modification because Wells was awaiting final approval.  (ECF No. 1-1 at 12, ¶ 17.)  On or about October 23, 2009, Ivy Nagel, Plaintiff's negotiator from Pro City Mortgage, informed Plaintiff that he had been approved for a loan modification and that he would receive a package from Wells within seven to ten days.  (ECF No. 1-1 at 12, ¶ 18.)  Nagel allegedly informed Plaintiff that the terms, as she understood them from Wells, were that Plaintiff's loan was to be modified to a five-year fixed interest rate, probably around 2%, and then increase 1% per year after five years, but not to exceed 6%.  Nagel allegedly informed Plaintiff that his modification would result in payments ranging from $1,600 to $1,700 per month.  (ECF No. 1-1 at 12, ¶ 18.)

About one week later, Plaintiff allegedly spoke with a representative from Pro City Mortgage who informed Plaintiff that Wells was denying him a loan modification due to "net negative income."  (ECF No. 1-1 at 12, ¶ 19.)  On or about December 14, 2009, Plaintiff spoke

---

[1]In or about March 2009, Plaintiff engaged the services of Pro City Mortgage, a company that claimed to specialize in securing loan modification for its clients.  Pro City Mortgage was hired to represent Plaintiff in the loan modification process.  (ECF 1-1 at 12, ¶ 15.)  In or about August 2010, Plaintiff informed Wells that Pro City Mortgage was no longer authorized to represent him.  (ECF 1-1 at 16, ¶ 35.)

with Lisa Walker from Pro City Mortgage who told Plaintiff that she learned that Plaintiff was still in HAMP review, but his file was taking longer than expected.  (ECF No. 1-1 at 12, ¶ 20.)

On or about December 30, 2009, Laurie Adomo from Pro City Mortgage informed Plaintiff that Wells required supplemental income information for Plaintiff's fiancée, Brooke Petersen, because Wells was aware that Ms. Petersen was living in the Subject Property with Plaintiff.  (ECF No. 1-1 at 13, ¶ 21.)  According to Adomo, Plaintiff was qualified for HAMP and his modification would be approximately $2,058.40 per month on a trial basis, but his file needed to go through one more department at Wells.  (ECF No. 1-1 at 13, ¶ 21.)  In addition, Wells informed Adomo that if Plaintiff completed three months of trial payments, his modification would be finalized and his first payment would be due February 1, 2010.  (ECF No. 1-1 at 13, ¶ 21.)  On or about December 31, 2009, Wells mailed Plaintiff a HAMP Trial Period Plan ("TPP"). (ECF No. 1-1 at 13, ¶ 22; ECF No. 1-1 at 50.)  Plaintiff alleges that the TPP provided that if Plaintiff complied with the terms of the agreement and qualified, Wells would provide Plaintiff with a permanent loan modification agreement.  (ECF No. 1-1 at 13, ¶ 22, 50.)

On or about March 19, 2010, Walter Pajares at Pro City Mortgage informed Plaintiff again that Wells would make Plaintiff's modification permanent after Plaintiff made his third TPP payment.  (ECF No. 1-1 at 14, ¶ 28.)  Pajares advised Plaintiff to continue making additional modified payments until the modification was finalized.  (ECF No. 1-1 at 14, ¶ 28.) On or about June 17, 2010, Plaintiff called Wells (866-359-1569), and a representative from Wells told Plaintiff that there was no time frame for finalization but to continue making payments of $2,058.40 per month.  (ECF No. 1-1 at 14, ¶ 29.)

On or about June 23, 2010, Plaintiff allegedly spoke with Howard Welling, who identified himself as a Wells representative.  (ECF No. 1-1 at 14, ¶ 30.)  Plaintiff contends that Welling advised Plaintiff to continue making modified trial payments, that the loan modification would be finalized soon after, and that the final monthly payment amount would be 31% of Plaintiffs gross monthly wages.  (ECF No. 1-1 at 14, ¶ 30.)  Welling also stated that Wells had validated all of Plaintiffs information and provided documents, that the modification had gone through two levels of review, and that his file had been sent to underwriting for final approval.

3

(ECF No. 1-1 at 14, ¶ 30.)  Welling further stated that while a decision was about three to five weeks away, it looked "good."  (ECF No. 1-1 at 14, ¶ 30.)  Finally, Welling allegedly confirmed that Plaintiff had been in HAMP review since December 31, 2009, and that Plaintiffs file "definitely" showed that his modification would be 31% of gross income.  (ECF No. 1-1 at 14, ¶ 30.)

On or about July 28, 2010, a Wells representative, "Abed," informed Plaintiff that his HAMP loan modification had been denied on July 27, 2010, because he had an income deficit of $1,895.22.  (ECF No. 1-1 at 14, ¶ 31.)  Abed allegedly explained that while Wells allowed for a deficit under HAMP, the deficit could be no more than $800.00 to $1,000.00.  (ECF No. 1-1 at 14, ¶ 31.)  However, Abed told Plaintiff that if he filed for Chapter 7 bankruptcy to eliminate his credit card debt, Plaintiff would be approved for a loan modification.  (ECF No. 1-1 at 14, ¶ 31.)

On or about August 3, 2010, Plaintiff alleges that a representative of Wells' loss mitigation department (800-416-1472) informed Plaintiff that Wells had instituted a new procedure with respect to loan modifications, and that Plaintiff needed to send in a new HAMP application and supporting documentation with a three-day turnaround on the application.  (ECF No. 1-1 at 16, ¶ 35.)  Plaintiff inquired as to the method Wells utilized in determining his income, and whether Wells considered his gross monthly income or his net monthly income.  (ECF No. 1-1 at 16, ¶ 35.)  The representative, who stated he was a HAMP specialist, told Plaintiff that Wells did not have HAMP guidelines regarding deficit income and that Plaintiff was given incorrect information.  (ECF No. 1-1 at 16, ¶ 35.)  On or about August 6, 2010, Wells allegedly informed Plaintiff that his file was still in review and that the process would take 45 days.  (ECF No. 1-1 at 16, ¶ 35.)

Plaintiff allegedly called Wells' Loss Mitigation department again on or about August 20, 2010, and spoke with "Carol," who told Plaintiff that he was still in HAMP review and that he should continue making TPP payments.  (ECF No. 1-1 at 16, ¶ 36.)  Carol also informed Plaintiff that she would send an escalation email to a "team of supervisors" regarding his file, but that Plaintiff should send in updated documents, a hardship letter, financial worksheet, and updated paystubs.  (ECF No. 1-1 at 16, ¶ 36.)  Plaintiff alleges he sent in all

4

1   documents as requested via fax to (866) 359-7363.  (ECF No. 1-1 at 16, ¶ 36.)  On or about

2   September 2, 2010, Plaintiff called Wells' bankruptcy department (800-274-7025) to inquire

3   about his options, as a sale date was nearing.  (ECF No. 1-1 at 16, ¶ 37.)  Wells' representative

4   allegedly advised Plaintiff that he was approved for HAMP but implied that he should probably

5   file for bankruptcy in order to eliminate his credit card debt as that was hindering his final

6   approval.  (ECF No. 1-1 at 16, ¶ 37.)

7           On or about September 14, 2010, Plaintiff received a returned payment from Wells

8   for $2,215.11, representing his previous TPP payment of $2,058.40 and an additional $156.71.

9   (ECF No. 1-1 at 17, ¶ 38.)  Plaintiff called Wells the next day, on or about September 15, 2010,

10   and allegedly spoke with "Tinika" at collections.  (ECF No. 1-1 at 17, ¶ 38.)  Tinika informed

11   Plaintiff that his file was no longer active, and that the house would be sold on October 26, 2010.

12   (ECF No. 1-1 at 17, ¶ 38.)  On or about September 28, 2010, Plaintiff called Wells and spoke

13   with "Kimberly" (877-335-1909, extension 85549).  (ECF No. 1-1 at 17, ¶ 39.)  Kimberly

14   allegedly told Plaintiff that he was still in review and that the foreclosure sale was postponed to

15   November 29, 2010, but he needed to send in a new IRS Form 4506-T for HAMP review.[2]  (ECF

16   No. 1-1 at 17, ¶ 39.)  Kimberly informed Plaintiff that if he filed for bankruptcy, they could not

17   sell the Subject Property while the bankruptcy was pending.  (ECF No. 1-1 at 17, ¶ 39.)

18   However, Kimberly advised that he should try a HAMP loan modification first.  (ECF No. 1-1 at

19   17, ¶ 39.)

20           On or about February 15, 2011, Wells' loss mitigation department (800-416-1472)

21   allegedly told Plaintiff that his file was active in foreclosure but there was no sale date noticed.

22   (ECF No. 1-1 at 17, ¶ 41.)  The representative allegedly told Plaintiff that they had received his

23   hardship letter, paystubs, and financial worksheet and that Plaintiff was "pre-approved" for

24   HAMP again.  (ECF No. 1-1 at 17, ¶ 41.)  The representative told Plaintiff that he simply needed

25   to send in a Dodd-Frank certification and a letter from Plaintiff's fiancée, Ms. Petersen,

26   confirming that she was able to contribute $1,200.00 per month towards the monthly mortgage

27   payments.  (ECF No. 1-1 at 17, ¶ 41.)  On or about February 22, 2011, Plaintiff called Wells and

28   _____
[2] An IRS Form 4506-T is used to order a transcript of tax return or other return information free of charge.

spoke with Connie Salgado, a self-identified Wells loan processor.  (ECF No. 1-1 at 17, ¶ 42.)
Salgado explained the review process to Plaintiff, including how information is inputted into a
Treasury Department formula.  (ECF No. 1-1 at 17–18, ¶ 42.)  Salgado informed Plaintiff that all
of his paperwork was submitted and the process should take two to three weeks—about a week
for initial approval, then another week or so to get second level approval from "the investor,"
Goldman Sachs.  Salgado told Plaintiff that he was "20 months behind in payments" but that he
had "a 98% chance" of being approved for the loan modification.  (ECF No. 1-1 at 17–18, ¶ 42.)

On or about March 8, 2011, Plaintiff called Wells' bankruptcy department who
told Plaintiff that he was still under review, but that there was a foreclosure sale date of April 5,
2011 showing.  (ECF No. 1-1 at 18, ¶ 43.)  Plaintiff was again asked to send in all financial
documents, IRS Form 4506-T, Petersen's proof of income, and bank statements.  (ECF No. 1-1 at
18, ¶ 43.)  On or about March 17, 2011, Plaintiff spoke with Salgado again.  (ECF No. 1-1 at 18,
¶ 44.)  Salgado allegedly stated that all she needed was Petersen's 2009 tax return, but that
Plaintiff's file "looked good" for a loan modification "unless the investor felt the he was too far
behind on his payments."  (ECF No. 1-1 at 18, ¶ 44.)  On or about March 21, 2011, Salgado told
Plaintiff that he was denied for a loan modification.  (ECF No. 1-1 at 18, ¶ 45.)

From about April 2011 until about November 2011, Plaintiff spoke with various
representatives of Wells regarding his denial for a permanent loan modification and was informed
that he did not qualify due to the net present value ("NPV") calculations.  (ECF No. 1-1 at 18–19,
¶ 46–50.)  On or about June 21, 2012, Wells caused the Subject Property to be sold at a non-
judicial foreclosure sale. (ECF No. 1-1 at 19, ¶ 50.)

Based on Plaintiff's information and belief, Plaintiff alleges the following: Wells
was required to follow the Federal Department of the Treasury's servicing guidelines for HAMP
loan modifications when offering TPPs and loan modifications in order to receive Troubled Asset
Relief Program ("TARP") funds, (ECF No. 1-1 at 13, ¶ 23(a)), and under the HAMP servicing
guidelines for Fannie Mae in effect at the time the TPP was offered, Plaintiff asserts that he was
deemed eligible for a HAMP loan modification because a TPP could only be offered once
eligibility was confirmed.  (ECF No. 1-1 at 13, ¶ 22(b).)  Plaintiff further alleges that Abed's

6

representation regarding Plaintiff's gross monthly income was incorrect and untrue because Wells' calculation of Plaintiff's income did not include reimbursement for mileage or Petersen's income.[3]  (ECF No. 1-1 at 15, ¶ 32.)   In addition, Plaintiff contends that Wells already calculated a trial modification amount and had determined that it was more profitable to modify the Subject Loan under HAMP than to foreclose upon the Subject Property.  (ECF No. 1-1 at 13, ¶ 23(c)–(d).)  Plaintiff made all three payments required under the TPP on time.  (ECF No. 1-1 at 14, ¶ 25–27.)  For these reasons, Plaintiff believes that he was entitled to a permanent loan modification under the TPP.  (ECF No. 1-1 at 14, ¶ 24.)

Plaintiff brings this suit against Defendants Wells, HSBC, and DOES 1–50 for: 1) Breach of Contract; 2) Promissory Estoppel; 3) Negligence; 4) Intentional Misrepresentation; 5) Negligent Misrepresentation; 6) Wrongful Foreclosure; 7) Conversion; 8) Violation of Business and Professions Code section 17200; 9) Unjust Enrichment; and 10) Equitable Accounting.

## II.  STANDARD OF LAW

Federal Rule of Civil Procedure 8(a) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  Under notice pleading in federal court, the complaint must "give the defendant fair notice of what the claim . . . is and the grounds upon which it rests."  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted).  "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

On a motion to dismiss, the factual allegations of the complaint must be accepted as true.  *Cruz v. Beto*, 405 U.S. 319, 322 (1972).  A court is bound to give plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint.  *Retail Clerks Int'l Ass'n v. Schermerhorn*, 373 U.S. 746, 753 n.6 (1963).  A plaintiff need not allege "'specific facts' beyond those necessary to state his claim and the grounds showing

[3]Petersen's income refers to the income made by Plaintiff's aforementioned fiancée, Brooke Petersen, who was living with Plaintiff in the Subject Property.

entitlement to relief." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. 544, 556 (2007)).

Nevertheless, a court "need not assume the truth of legal conclusions cast in the form of factual allegations." *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986).  While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.  A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Moreover, it is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged[.]" *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

Ultimately, a court may not dismiss a complaint in which the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 697 (quoting *Twombly*, 550 U.S. at 570).  Only where a plaintiff fails to "nudge[] [his or her] claims . . . across the line from conceivable to plausible[,]" is the complaint properly dismissed. *Id.* at 680.  While the plausibility requirement is not akin to a probability requirement, it demands more than "a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.  This plausibility inquiry is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

In ruling upon a motion to dismiss, the court may consider only the complaint, any exhibits thereto, and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201. *See Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988); *Isuzu Motors Ltd. v. Consumers Union of United States, Inc.*, 12 F. Supp. 2d 1035, 1042 (C.D. Cal. 1998).

If a complaint fails to state a plausible claim, " '[a] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.' " *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 484, 497 (9th Cir. 1995)); *see also Gardner v. Marino*, 563 F.3d 981, 990 (9th Cir. 2009) (finding no abuse of discretion in denying leave to amend when amendment would be futile). Although a district court should freely give leave to amend when justice so requires under Rule 15(a)(2), "the court's discretion to deny such leave is 'particularly broad' where the plaintiff has previously amended its complaint[.]" *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 520 (9th Cir. 2013) (quoting *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 622 (9th Cir. 2004)).

**III. ANALYSIS**

    **a. <u>Breach of Contract (Count I)</u>**

Plaintiff brings a claim for breach of contract against Defendants alleging Wells did not offer Plaintiff a permanent loan modification after he complied with the TPP. (ECF No. 1-1 at 22, ¶ 73.) Defendants argue that the TPP was not a contract. (ECF No. 4 at 6.) For the reasons set forth below, the Court finds that Plaintiff has adequately pled a breach of contract claim.

A cause of action for breach of contract requires the pleading of a contract, plaintiff's performance or excuse for failure to perform, defendant's breach, and damage to plaintiff resulting therefrom. *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1489 (2006). Here, the parties dispute whether a contract exists.

The Ninth Circuit has recently held that, ". . . a TPP Agreement offered pursuant to HAMP is a contract, and a party to that contract may sue for breach if the lender violates a term contained within the four corners of the TPP." *Lazo v. Caliber Home Loans, Inc.*, No. 1:13-CV-2015 AWI JLT, 2015 WL 590663, at *5 (E.D. Cal. Feb. 12, 2015) (citing *Corvello v. Wells Bank, N.A.*, 728 F.3d 878, 880 (9th Cir. 2013), *as amended on reh'g in part* (Sept. 23, 2013)). *See also Wigod v. Wells Bank, N.A.*, 673 F.3d 547, 563 (7th Cir. 2012). "Once the bank [has] determined that a borrower had complied and the representations were still true, then the bank [is] required by

1    the agreement to offer a permanent modification."  *Corvello*, 728 F.3d at 884.  *See also Wigod*,

2    673 F.3d at 563 ("Wells still had an obligation to offer Wigod a permanent modification once she

3    satisfied all her obligations under the agreement"); *Bushell v. JPMorgan Chase Bank, N.A.*, 220

4    Cal. App. 4th 915, 925–26 (2013) ("if a borrower complies with all terms of the TPP—including

5    making all required payments and providing all required documentation—and if the borrower's

6    representations on which modification is based remain true and correct, the lender *must offer* the

7    borrower a good faith permanent loan modification, because the borrower has qualified under

8    HAMP and has complied with the TPP"); *W. v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th

9    780, 788 (2013), *reh'g denied* (Apr. 11, 2013), *review denied* (July 10, 2013) ("[a]fter the trial

10    period, if the borrower complied with all terms of the TPP Agreement [. . .] and if the borrower's

11    representations remained true and correct, the servicer had to offer a permanent modification").

12          Here, Plaintiff alleges that the HAMP TPP was a contract between the parties

13    conditioned on Plaintiff making the three payments required under the TPP.  (ECF No. 1-1 at 22,

14    ¶ 73.)  Plaintiff alleges that because he completed the three required payments and was qualified

15    for HAMP, Wells breached the contract by not permanently modifying Plaintiff's loan.  (ECF No.

16    1-1 at 22, ¶¶ 74–75.)  Defendants argue that the permanent loan modification was conditioned

17    upon Plaintiff qualifying for the loan modification program.  (ECF No. 4 at 6.)  Defendants allege

18    that Wells was not required to offer a permanent loan modification because Plaintiff did not

19    qualify for a loan.  (ECF No. 4 at 8.)  Defendants further argue that Plaintiff did not allege any

20    facts showing he qualified for the loan modification program.  (ECF No. 4 at 7–8.)

21          In order to support their contention that the TPP was not a contract, Defendants

22    rely on conditional language within Plaintiff's TPP[4] and the letter Wells sent with the TPP[5] which

---

23    [4] Plaintiff's TPP states the following conditional language: "If I am in compliance with this Loan Trial Period and my

24    representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan
Modification Agreement [. . .]" (ECF No. 1-1 at 55), "I understand that after I sign and return two copies of this Plan

25    to the Lender, the Lender will send me a signed copy of this Plain if I qualify for the Offer or will send me a written
notice that I do not qualify for the Offer" (ECF No. 1-1 at 55), "I understand that the Plan is not a modification of the
Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions

26    required for modification, (ii) I receive a fully executed copy of the Modification Agreement, and (iii) the
Modification Effective Date has passed" (ECF No. 1-1 at 56, ¶ 2(G)), and "[i]f I comply with the requirements in

27    Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a
Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new

28    payment amount and waive any unpaid late charges accrued to date."  (ECF No. 1-1 at 56–57, ¶ 3.)

required that Plaintiff qualify under HAMP in order for Wells to offer a permanent loan

modification.  (ECF No. 4 at 6–8.)  However, courts have consistently found that HAMP TPPs

constitute a contract, despite the lender's use of conditional language, so long as the borrower

performs.  *See Corvello*, 728 F.3d at 881 (upholding a TPP as a contract, despite language stating,

"[i]f I am in compliance with this Loan Trial Period and my representations in Section 1 continue

to be true in all material respects, then the Lender will provide me with a Loan Modification

Agreement"); *Bushell*, 220 Cal. App. 4th at 919–920 (upholding a TPP as a contract, despite

language stating, "[i]f you qualify under [HAMP] and comply with the terms of the [trial

modification plan], we will modify your mortgage loan and you can avoid foreclosure"); *JP

Morgan Chase Bank*, 214 Cal. App. 4th at 796 (holding the TPP was a contract, despite language

stating, "[i]f all payments are made as scheduled, we will reevaluate your application for

assistance and determine if we are able to offer you a permanent workout solution to bring your

loan current").  Thus, so long as Plaintiff sufficiently alleges that he qualified for HAMP and

made the three payments required under the TPP, Plaintiff has alleged the existence of a contract.

While Defendants do not dispute that Plaintiff made the payments required under

the TPP, Defendants wrongfully assert that Plaintiff fails to plead any facts that show he did

qualify for HAMP.  (ECF No. 4 at 12.)  Plaintiff argues he qualified for HAMP for two reasons.

First, Plaintiff contends that Wells miscalculated his gross income which resulted in an

underestimation of his income.  (ECF No. 1-1 at 15, ¶¶ 32–33.)  Plaintiff alleges that Wells's

miscalculation lead to Wells' denial of Plaintiff's loan modification application.  (ECF No. 1-1 at

---

[5] The letter Wells sent with the TPP provided the following: "[y]ou may qualify for a Home Affordable Modification Trial Period Plan—a way to make your payment more affordable" (ECF No. 1-1 at 50), "[i]f you qualify under the federal government's Home Affordable Modification program and comply with the terms of the Trial Period Plan, we will modify your mortgage loan and you can avoid foreclosure" (ECF No. 1-1 at 50), "[t]he monthly trial period payments are based on the income information that you previously provided to use.  They are also our estimate of what your payment will be IF we are able to modify your loan under the terms of the program.  If your income documentation does not support the income amount that you previously provided in our discussions, two scenarios can occur: 1) Your monthly payment under the Trial Period Plan may change [or] 2) You may not qualify for this loan modification program" (ECF No. 1-1 at 50), "[t]o accept this offer, and see if you qualify for a Home Affordable Modification [. . .]" (ECF No. 1-1 at 51), "[o]nce we are able to confirm your income and eligibility for the program, we will finalize your modified loan terms and send you a loan modification agreement [ ], which will reflect the terms of your modified loan" (ECF No. 1-1 at 52), "[i]f you fulfill the terms of the trial period including, but not limited to, making the trial period payments, we will waive ALL unpaid late charges at the end of the trial period" (ECF No. 1-1 at 52), and "[p]lease note, however, that your modification will not be effective unless you meet all of the applicable conditions, including making all trial period payments."  (ECF No. 1-1 at 53.)

15, ¶¶ 32–33.)  Second, Plaintiff alleges that Wells had already determined that Plaintiff qualified for HAMP when it offered him the TPP.  (ECF No. 1-1 at 23, ¶¶ 74–75.)  "When a lender offers a TPP to a distressed borrower, the lender effectively has already determined that the borrower qualifies for HAMP, assuming that the borrower's representations on which modification is based remain true and correct."  *Bushell v. JPMorgan Chase Bank, N.A.*, 220 Cal. App. 4th 915, 924 (2013); *see also* U.S. Dept. Treasury, HAMP Supplemental Directive No. 09–01, Apr. 6, 2009, pp. 2–5, 8–10, 14–15.  Because Defendants do not contend that Plaintiff failed to make true and correct representations, Plaintiff argues that Wells determined that he qualified for HAMP prior to sending the TPP.

The Court finds that Plaintiff adequately alleges that he qualified for HAMP because he makes plausible factual allegations that Wells miscalculated his gross income and Wells had deemed Plaintiff qualified under HAMP prior to entering into a TPP with him. Accepting Plaintiff's factual allegations as true, Plaintiff has sufficiently alleged that he qualified for HAMP and made the TPP payments on time, and thus met all of the conditions of the TPP. *Cruz v. Beto*, 405 U.S. 319, 322 (1972).  Because Plaintiff argues that he met all of the conditions of the TPP, Plaintiff properly alleges that Wells was required to permanently modify Plaintiff's loan per the TPP.  As such, the Court finds that Plaintiff has stated a claim for breach of contract, and Defendants' motion to dismiss Plaintiff's First Cause of Action is DENIED.

### b. Promissory Estoppel (Count II)

Plaintiff brings a claim for promissory against Defendants alleging Plaintiff detrimentally relied on Wells' promise to modify his loan.  (ECF No. 1-1 at 22, ¶ 73.) Defendants argue that there was no definite promise because the TPP was conditioned upon Plaintiff qualifying for HAMP.  (ECF No. 4 at 14.)  For the reasons set forth below, the Court finds that Plaintiff has adequately pled promissory estoppel.

To state a cause of action for promissory estoppel, a plaintiff must allege "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) his reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance."  *Laks v. Coast Fed. Sav. & Loan Ass'n*, 60 Cal. App. 3d

1    885, 890 (1976) (citing *Thomson v. Internat. Alliance of Stage Employees*, 232 Cal. App. 2d 446,

2    454 (1965)).  "To be enforceable, a promise need only be '"definite enough that a court can

3    determine the scope of the duty[,] and the limits of performance must be sufficiently defined to

4    provide a rational basis for the assessment of damages."' *Aceves v. U.S. Bank, N.A.*, 192 Cal.

5    App. 4th 218, 226 (2011), *as modified* (Feb. 9, 2011) (quoting *Garcia v. World Sav., FSB*, 183

6    Cal. App. 4th 1031, 1045 (2010)).

7              Courts have consistently held that a TPP can contain a promise definite enough for

8    a court to determine the scope of the parties' duties.  *See Bushell*, 220 Cal. App. 4th at 930 ("[t]he

9    allegation of the TPP contract—through which a permanent modification was to be offered if

10   certain conditions were met—meets the element of a clear and unambiguous promise"); *Wigod*,

11   673 F.3d at 566 (holding that the plaintiff sufficiently alleged that the defendant "made an

12   unambiguous promise that if she made timely payments and accurate representations during the

13   trial period, she would receive an offer for a permanent loan modification"); *JPMorgan Chase*

14   *Bank, N.A.*, 214 Cal. App. 4th at 805 (upholding the plaintiff's cause of action for promissory

15   estoppel based on defendant's alleged promise in the TPP to modify the plaintiff's loan and not

16   pursue foreclosure proceedings during the trial loan period).  *See also Fleet v. Bank of Am. N.A.*,

17   229 Cal. App. 4th 1403, 1413 (2014) (holding that the plaintiffs "alleged facts that could support

18   a cause of action for promissory estoppel against [Bank of America] in the event that they cannot

19   establish a cause of action for breach of contract").

20             In *Wigod*, the Seventh Circuit Court of Appeals held the plaintiff's cause of action

21   for promissory estoppel alleged a "sufficiently clear promise," as well as detrimental reliance.

22   *Wigod*, 673 F.3d at 566.  The court stated, "[the plaintiff] asserts that Wells Fargo made an

23   unambiguous promise that if she made timely payments and accurate representations during the

24   trial period, she would receive an offer for a permanent loan modification calculated using the

25   required HAMP methodology."  *Id.*  The court concluded the plaintiff relied on that promise to

26   her detriment by foregoing the opportunity to use other remedies to save her home and by

27   devoting her resources to making the lower monthly payments under the TPP rather than

28   attempting to sell her home or defaulting.  *Id.*

                                                13

1    In the instant case, Defendants again argue that Wells' alleged promise was

2  conditioned upon Plaintiff's qualifying for a permanent loan modification, and Plaintiff is unable

3  to show that he had sufficient income to qualify for HAMP.  (ECF No. 4 at 14.)  Defendants

4  argue that Plaintiff could not reasonably rely on such qualification language.  (ECF No. 4 at 14.)

5  This Court disagrees.

6    Here, the alleged promise is clear and unambiguous because it is "sufficiently

7  definite to determine the scope of the promise and respondent's obligation."  *Garcia*, 183 Cal.

8  App. 4th at 1045.  Specifically, the language of the letter and the TPP includes:

9    [i]f you qualify under the federal government's Home Affordable
10    Modification [P]rogram and comply with the terms of the Trial
    Period Plan, we will modify your mortgage loan and you can avoid
11    foreclosure" (ECF No. 1-1 at 50), and "[o]nce we are able to
    confirm your income and eligibility for the program, we will
12    finalize your modified loan terms and send you a loan modification
    agreement [ ], which will reflect the terms of your modified loan

13    . . .

14    If I am in compliance with this Loan Trial Period and my
15    representations in Section 1 continue to be true in all material
    respects, then the Lender will provide me with a Loan Modification
16    Agreement [. . .].

17   (ECF No. 1-1 at 52, 55).  As previously stated, Plaintiff has sufficiently alleged that he qualified

18  for HAMP and therefore could meet all of the requirements of the promise.  As such, Plaintiff

19  could reasonably rely on the promise of a loan modification.  Thus, Plaintiff sufficiently alleges

20  Wells made a clear and definite promise that it would modify Plaintiff's loan because he adhered

21  to the requirements and was already qualified for HAMP.

22    Plaintiff further alleges that he relied on that promise by making the required

23  payments under the TPP which put him further into default, thus satisfying the reliance

24  requirement.  (ECF No. 1-1 at 25, ¶ 79.)  Additionally, the Court finds that Plaintiff's reliance

25  was reasonable and foreseeable because the parties negotiated the modification for more than a

26  year.  (ECF No. 1-1 at 25, ¶ 80.)  Finally, the reliance was to Plaintiff's detriment because

27  Plaintiff was put into further default and accelerated foreclosure proceedings.  (ECF No. 1-1 at

28

1   25, ¶ 81).

2          Thus, the Court finds that Plaintiff has stated a claim for promissory estoppel, and

3   Defendants' motion to dismiss Plaintiff's Second Cause of Action is DENIED.

4          **c.   Negligence (Count III)**

5          Plaintiff alleges that Defendants negligently mishandled Plaintiff's loan

6   modification application.  (ECF No. 1-1 at 26, ¶¶ 85–86.)  Defendants argue that Wells did not

7   owe Plaintiff a duty of care in considering his loan modification application.[6]  (ECF No. 4 at 15.)

8   The Court finds that Plaintiff has stated a claim for negligence because Defendants owed Plaintiff

9   a duty of care in considering his loan modification.

10         The elements of a negligence cause of action are: (1) the existence of a duty to

11  exercise due care; (2) breach of that duty; (3) causation; and (4) damages.  *See Merrill v.*

12  *Navegar, Inc.*, 26 Cal.4th 465, 500 (2001).  Whether a duty of care exists is a question of law to

13  be determined on a case-by-case basis.  *Lueras v. BAC Home Loans Servicing, LP*, 221 Cal. App.

14  4th 49, 62 (2013).

15                            i.   *Duty of Care*

16         In California, the general rule is that "a financial institution owes no duty of care

17  to a borrower when the institution's involvement in the loan transaction does not exceed the scope

18  of its conventional role as a mere lender of money."  *Nymark v. Heart Fed. Savings & Loan*

19  *Assn.*, 231 Cal. App. 3d 1089, 1096 (1991).  Still, "*Nymark* does not support the sweeping

20  conclusion that a lender never owes a duty of care to a borrower."  *Alvarez v. BAC Home Loans*

21  _____

22  [6] Defendants also argue that Plaintiff's claims for negligence, intentional misrepresentation, and negligent misrepresentation are time-barred because the alleged damages occurred when the alleged misrepresentations occurred or when Plaintiff's loan modification efforts concluded either in February 2011 or November 2011.  (ECF

23  No. 4 at 15–16.)  However, Defendants offer no authority for why the statute of limitations should begin to accrue during these times instead of when the Subject Property foreclosed.  In addition, Plaintiff alleges that Wells denied

24  Plaintiff's HAMP loan modification twice.  (ECF No. 1-1 at 15 & 18, ¶ 31, 45).  During that time, Plaintiff alleges that Wells's representatives kept him in a state of uncertainty, oscillating between whether he was still in HAMP

25  review (ECF No. 1-1 at 16–18, ¶¶ 36, 39, 42–44) or was approved for HAMP (ECF No. 1-1 at 16–17, ¶¶ 37, 41) and whether he was informed that his file was no longer active (ECF No. 1-1 at 17, ¶ 38) or the foreclosure proceedings on his house were active.  (ECF No. 1-1 at 17, ¶¶ 38, 41.)  In May 2011, Plaintiff finally requested to be removed

26  from HAMP review and to be considered for a traditional in-house loan modification.  (ECF No. 1-1 at 18, ¶ 48.)  For these reasons, Plaintiff could not be certain when he had a claim.  As such, the Court declines Defendants'

27  invitation to create new law, and the Court finds the statute of limitations began accruing when it became evident to Plaintiff that the modifications would not be granted, when the Subject Property was foreclosed on June 21, 2012.

28  Thus, these claims were timely filed.

1    *Servicing, L.P.*, 228 Cal. App. 4th 941, 945 (2014).

2          In order to determine whether a duty of care exists, courts balance the *Biakanja*

3 factors, "among which are [1] the extent to which the transaction was intended to affect the

4 plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff

5 suffered injury, [4] the closeness of the connection between the defendant's conduct and the

6 injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of

7 preventing future harm."[7]  *See Nymark*, 231 Cal. App. 3d, at 1098 (citing *Biakanja v. Irving*, 49

8 Cal.2d 647 (1958)).  In *Nymark*, the California Third District Court of Appeals applied these

9 factors to determine "whether a financial institution owes a duty of care to a borrower-client."

10 *Nymark*, 231 Cal. App. 3d at 1098.

11          Recently, California appellate courts have started applying this balancing test to

12 loan modification cases, which has resulted in different conclusions as to whether a lender owes a

13 borrower a duty of care when considering a loan modification.  *Compare Alvarez*, 228 Cal. App.

14 4th at 948 (finding that a lender/servicer has no general duty to offer modification, but special

15 relationship does arise when a lender/servicer agrees to consider a borrower's loan modification

16 application) and *Jolley v. Chase Home Fin., LLC*, 213 Cal. App. 4th 872, 906 (2013), *as modified*

17 *on denial of reh'g* (Mar. 7, 2013) (finding that commercial lending creates a special relationship,

18 and thus imposes a duty of care), *with Lueras*, 221 Cal. App. 4th at 67 (finding that residential

19 loan modification is a traditional lending activity, and does not create a duty of care).  Federal

20 district courts in California have also reached different results.  *Compare*, e.g., *Segura v. Wells*

21 *Bank, N.A.*, No. CV-14-04195-MWF AJWX, 2014 WL 4798890 (C.D. Cal. Sept. 26, 2014) (a

22 duty of care exists once the lender offers a borrower the opportunity to apply for a modification),

23 *Penermon v. Wells Home Mortgage*, No. 14-CV-00065-KAW, 2014 WL 4273268 (N.D. Cal.

24 Aug. 28, 2014) (plaintiff was not entitled to modification, but "once [defendant] provided

25 Plaintiff with the loan modification application and asked her to submit supporting

26 documentation, it owed her a duty to process the completed application once it was submitted"),

27

_____

28 [7] *Biankaja* applied the balancing test to determine whether a defendant could be held liable to a third person not in privity with the defendant.

1   *Johnson v. PNC Mortgage*, __ F. Supp. 3d __, 2015 WL 662261, at *4 (N.D. Cal. Feb. 12, 2015)

2   ("[o]nce PNC offered the Johnsons an opportunity to modify their loan, it owed them a duty to

3   handle their application with ordinary care"), *and Banks v. JP Morgan Chase Bank, N.A.*, No. LA

4   CV14–06429 JAK (FFMx), 2014 WL 6476139, at *12 (C.D. Cal. Nov. 19, 2014) ("[t]aken

5   together, [California] cases establish that traditional money-lending activity does not create a duty

6   of care (*Nymark*), and that a loan modification is generally deemed a traditional money-lending

7   activity (*Lueras*).  They also support the conclusion that servicer conduct during the modification

8   negotiation process may create a special relationship and a resulting duty of care (*Alvarez*)") *with*

9   *Valencia v. Wells Home Mortgage Inc.*, No. C 14-3354 CW, 2014 WL 5812578, at *7 (N.D. Cal.

10  Nov. 7, 2014) (holding that "[i]n the absence of any circumstances that would impose a duty of

11  care on [d]efendant, [d]efendant had no duty of care to [p]laintiffs in reviewing their application

12  for a HAMP modification") and *Colom v. Wells Home Mortgage, Inc.*, No. C-14-2410 MMC,

13  2014 WL 5361421, at *3 (N.D. Cal. Oct. 20, 2014) (dismissing plaintiff's negligence cause of

14  action that defendant failed to "offer[ ] [p]laintiff a loan modification" because "[a] lender [does]

15  not have a common law duty of care to offer, consider, or approve a loan modification" (citations

16  omitted)). [8]

17          Defendants assert that the majority rule in California is *Lueras*, where a lender

18  owes no duty of care to a borrower seeking loan modification.  (Def. s' Reply, ECF No. 7 at 10.)

19  In *Lueras*, the plaintiff sued the defendant lender/servicer under a negligence cause of action for

20  mishandling or failing to approve a HAMP loan modification.  *Lueras*, 221 Cal. App. 4th at 59.

21  The California Fourth District Court of Appeal held that "a loan modification is the renegotiation

22  of loan terms, which falls squarely within the scope of a lending institution's conventional role as

23  a lender of money."  *Id.* at 67.  The court explained that "[a] lender's obligations to offer,

24  consider, or approve loan modifications and to explore foreclosure alternatives are created solely

---

25  [8] Other courts have interpreted *Alvarez* to establish an exception to the general rule.  *See Hetrick v. Deutsche Bank Nat'l Trust Co.*, No. F067675, 2014 WL 6657504, at *18 (Cal. Ct. App. Nov. 24, 2014), *review filed* (Jan. 2, 2015)

26  (duty of care only arises when the lender "stepped beyond the role of a conventional lender" or the lender "affirmatively mishandled the [loan modification] application"); *Diunugala v. JP Morgan Chase Bank, N.A.*, __ F.

27  Supp. 3d __, 2015 WL 350559, at *7 (S.D. Cal. Jan. 21, 2015) (dismissing plaintiff's claim for negligence because "[p]laintiff did not allege specific mishandling of [p]laintiff's documents after an agreement to consider [p]laintiff's

28  modification application").

by the loan documents, statutes, regulations, and relevant directives and announcements." *Id.*

The court reasoned that under the *Biakanja* factors:

> If the modification was necessary due to the borrower's inability to repay the loan, the borrower's harm, suffered from denial of a loan modification, would not be closely connected to the lender's conduct.   If the lender did not place the borrower in a position creating a need for a loan modification, then no moral blame would be attached to the lender's conduct.

*Id.*  For this reason, the court concluded that the *Biakanja* factors weighed against the imposition of a common law duty of care.  *Id.*  Accordingly, no common law duty of care was imposed on the lender for purposes of pleading a cause of action for negligence.  *Id.* at 68.  However, the court did hold that "a lender does owe a duty to a borrower to not make material misrepresentations about the status of an application for a loan modification or about the date, time, or status of a foreclosure sale." *Id.*

Plaintiff urges the Court to follow *Alvarez*.  (ECF No. 6 at 13–16.)  In *Alvarez*, the plaintiffs alleged that the defendant lender mishandled the plaintiffs' HAMP home loan modification application.  *Alvarez*, 228 Cal. App. 4th at 951.  Specifically, the plaintiffs alleged that the "[d]efendants owed them a duty to exercise reasonable care in the review of their loan modification applications once they had agreed to consider them." *Id.* at 944.   The plaintiffs argued "that the defendants breached this duty by (1) failing to review plaintiffs' applications in a timely manner, (2) foreclosing on plaintiffs' properties while they were under consideration for a HAMP modification and (3) mishandling plaintiffs' applications by relying on incorrect information." *Id.* at 945.

The California First District Court of Appeal acknowledged the general rule, but explained that established case law "do[es] not purport to state a legal principle that a lender can never be held liable for negligence in its handling of a loan transaction within its conventional role as a lender of money." *Alvarez*, 228 Cal. App. 4th at 946 (citing *Jolly*, 213 Cal. App. 4th at 902).  The court intimated that while a loan modification is a renegotiation of loan terms, the relationship between the parties differs from that of the original lender and borrower relationship

18

1   because the parties are now in privity. *Id.* at 944 (a special relationship was created when

2   "defendants undertook to review plaintiffs' loans for potential modification") (internal quotations

3   omitted).  The court reasoned that a duty of care may arise out of that change in the parties'

4   relationship because the borrower and lender are no longer "in an arm's length transaction." *Id.*

5   at 945 (citing *Ragland v. U.S. Bank Nat'l Assn.*, 209 Cal. App. 4th 182, 206 (2012)).  The court

6   recognized that the relationship between the borrower and lender has changed from traditional

7   mortgage lending.  *Alvarez*, 228 Cal. App. 4th at 949.  Now, "borrowers are captive, with no

8   choice of servicer, little information, and virtually no bargaining power [. . . while] servicers may

9   actually have positive incentives to misinform and under-inform borrowers." *Id.* (citation

10  omitted).

11          When balancing the *Biankaja* factors, the court found that "[t]he transaction was

12  intended to affect the plaintiffs and it was entirely foreseeable that failing to timely and carefully

13  process the loan modification applications could result in significant harm to the applicants."

14  *Alvarez*, 228 Cal. App. 4th at 948.  With regard to the connection between the defendant's

15  conduct and the injury suffered, the court further found that "[a]lthough there was no guarantee

16  the modification would be granted had the loan been properly processed, the mishandling of the

17  documents deprived [p]laintiff of the possibility of obtaining the requested relief." *Id.* at 949

18  (quoting *Garcia v. Ocwen Loan Servicing, LLC*, No. C 10-0290 PVT, 2010 WL 1881098, at *3

19  (N.D. Cal. May 10, 2010)).  In so holding, the court reasoned that the fourth *Biakanja* factor

20  weighed in favor of a closer connection between the defendant's conduct and the injury suffered

21  due to the privity between the parties.  *Alvarez*, 228 Cal. App. 4th at 949.  The court also

22  interpreted the moral blame of the borrower to be low because "[t]he borrower's lack of

23  bargaining power coupled with conflicts of interest that exist in the modern loan servicing

24  industry provide a moral imperative that those with the controlling hand be required to exercise

25  reasonable care in their dealings with borrowers seeking a loan modification." *Id.*  Finally, the

26  court found that the policy of preventing future harm "strongly favor[ed] imposing a duty of care

27  on defendants" after the California Homeowner Bill of Rights ("HBOR") was effectuated on

28  January 1, 2013.  *Id.* at 950.  Thus, the court found that when a lender agrees to consider a

1   borrower's loan modification, the *Biajanka* factors weigh in favor of applying a duty of care.  *Id.*

2   at 948.

3          This Court finds the *Alvarez* reasoning persuasive.  *Alvarez* identified an important

4   distinction not addressed by the *Lueras* reasoning—that the relationship differs between the

5   lender and borrower at the time the borrower first obtained a loan versus the time the loan is

6   modified.  The parties are no longer in an arm's length transaction and thus should not be treated

7   as such.  While a loan modification is traditional lending, the parties are now in an established

8   relationship.  This relationship vastly differs from the one which exists when a borrower is

9   seeking a loan from a lender because the borrower may seek a different lender if he does not like

10  the terms of the loan.  Therefore, this Court adopts the holding in *Alvarez* and concludes that a

11  lender owes a duty of care to the borrower when considering his loan modification application.

12         Imposing a duty is supported by the *Biakanja* factors.  The loan modification

13  transaction was clearly intended to affect Plaintiff because he was in privity with Wells.  Wells'

14  decision would determine whether Plaintiff could keep his house, and it was foreseeable that

15  failing to carefully process Plaintiff's loan modification could result in Plaintiff losing his house.

16  As stated in *Garcia*, "[a]lthough there was no guarantee the modification would be granted had

17  the loan been properly processed, the mishandling of the documents deprived Plaintiff of the

18  possibility of obtaining the requested relief."  *Garcia*, 2010 WL 1881098, at *3; *see alsoAlvarez*,

19  228 Cal. App. 4th at 949.  Based on the foregoing, Plaintiff can show with a degree of certainty

20  that he suffered an injury when he lost his house.  Simply put, there is a close connection between

21  Wells' conduct and the foreclosure of Plaintiff's house since the parties had an existing

22  relationship prior to the loan modification application.[9]  Thus, the Court agrees with *Alvarez* that

23  the moral blame factor could easily tip in favor of Plaintiff because of the borrower's lack of

24  bargaining power and the conflicts of interest that exist in the modern loan servicing industry.

25  *See Alvarez*, 228 Cal. App. 4th at 949.  Finally, the policy of preventing future harm clearly

26  weighs in favor of Plaintiff after the passing of the HBOR, which "demonstrates a rising trend to

27  _____
    [9] As stated in *Alvarez*, "[s]hould plaintiffs fail to prove that they would have obtained a loan modification absent
    defendants' negligence, damages will be affected accordingly, but not necessarily eliminated."  *Alvarez*, 228 Cal.
28  App. 4th at 949.

1   require lenders to deal reasonably with borrowers in default to try to effectuate a workable loan

2   modification." *See id.* at 950 (quoting *Jolly*, 213 Cal. App. 4th at 903).  Thus, the Court finds that

3   Wells owed Plaintiff a duty of care in considering Plaintiff's loan modification application.

4           Plaintiff sufficiently alleges that Wells breached its duty of care by mishandling

5   Plaintiff's loan application and that this breach of duty directly and proximately caused Plaintiff

6   to not receive a loan modification and caused the foreclosure of the Subject Property.  (ECF No.

7   1-1 at 28, ¶¶ 86–87.)  The Court finds that Plaintiff has stated a claim for negligence, and

8   Defendants' motion to dismiss Plaintiff's Third Cause of Action is DENIED.

9                  **d.   Intentional and Negligent Misrepresentation (Count IV–V)**

10          Plaintiffs allege that Defendants either intentionally or negligently misrepresented

11   facts to Plaintiff, and Plaintiff relied on those misrepresentations.  (ECF No. 1-1 at 29–38.)

12   Defendants argue that both causes of action are insufficiently pled under Rule 9(b) because

13   Plaintiff merely alleges opinions, not facts.  (ECF No. 4 at 16–18.)  Plaintiff asserts that the

14   alleged misrepresentations in the complaint are factual statements made by Wells' agents, and

15   these agents made the statements without any reasonable grounds for believing their truth.  (ECF

16   No. 6 at 16–19.)  The Court finds Plaintiff has sufficiently pled both intentional and negligent

17   misrepresentation under Rule 9(b).

18          "In all averments of fraud or mistake, the circumstances constituting fraud or

19   mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  "Therefore, in an action based on

20   state law, while a district court will rely on state law to ascertain the elements of fraud that a party

21   must plead, it will follow Rule 9(b) in requiring that the circumstances of the fraud be pleaded

22   with particularity."  *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 996 (N.D. Cal. 2009); *see

23   also Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).  "[W]hen the claim is

24   'grounded in fraud,' the pleading of that claim as a whole is subject to Rule 9(b)'s particularity

25   requirement."  *Marolda*, 672 F. Supp. 2d at 997 (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d

26   1097, 1104 (9th Cir. 2003)).  Rule 9(b) requires the plaintiff to allege "the who, what, when,

27   where, and how" of the alleged fraudulent conduct.  *Cooper v. Pickett*, 137 F.3d 616, 627 (9th

28   Cir. 1997).  A plaintiff must describe the alleged fraud in specific enough terms "to give

1    defendants notice of the particular misconduct so that they can defend against the charge."

2    *Kearns*, 567 F.3d at 1124.  "The requirement of specificity in a fraud action against a corporation

3    requires the plaintiff to allege the names of the persons who made the allegedly fraudulent

4    representations, their authority to speak, to whom they spoke, what they said or wrote, and when

5    it was said or written."  *Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal. App. 4th 153, 157

6    (1991).

7              Under California law, the elements of intentional misrepresentation (that is, fraud)

8    are: "(1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge

9    of falsity (scienter); (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting

10   damages."  *Okun v. Morton*, 203 Cal. App. 3d 805, 828 (Ct. App. 1988).  "The elements of

11   negligent misrepresentation are similar to intentional fraud except for the requirement of scienter;

12   in a claim for negligent misrepresentation, the plaintiff need not allege the defendant made an

13   intentionally false statement, but simply one as to which he or she lacked any reasonable ground

14   for believing the statement to be true."  *Charnay v. Cobert*, 145 Cal. App. 4th 170, 184–85

15   (2006).

16              i.    *Misrepresentation*

17              Plaintiff's complaint states that he entered into a TPP with Wells (ECF No. 1-1 at

18   30, ¶ 92(a)(ii)); qualified for HAMP (ECF No. 1-1 at 15, ¶¶ 32–33; ECF No. 1-1 at 23, ¶ 74–75);

19   made all three payments on time under the TPP (ECF No. 1-1 at 14, ¶ 25–27); and that Wells did

20   not permanently modify Plaintiff's loan.  (ECF No. 1-1 at 18, ¶ 45.)  Plaintiff further alleges that

21   Wells informed Plaintiff through his representative that Plaintiff would receive a HAMP loan

22   modification when he made the three payments required under the TPP (ECF No. 1-1 at 30, ¶

23   92(a)(iii)), and that Wells informed Plaintiff that his loan modification "would be finalized soon"

24   and "[his] monthly payments would be 31% of [his] gross monthly income."  (ECF No. 1-1 at 31,

25   ¶ 92(a)(v)).  Plaintiff also received a TPP which stated that Plaintiff would receive a loan

26   modification if he made all three payments under the agreement and qualified for HAMP.  (ECF

27   No. 1-1 at 13, ¶ 22; ECF No. 1-1 at 50.)  Plaintiff additionally alleges that a Wells representative

28   "told [him] to miss payments in order to be considered for a loan modification" (ECF No. 1-1 at

31, ¶ 92(a)(i)), which Plaintiff asserts is a misrepresentation because "HAMP has no such requirement, and that the borrower only need be in imminent danger of being in default." (ECF No. 1-1 at 31, ¶ 92(c)(i)). These allegations consisting of false representations are sufficient to meet the fraud element of misrepresentation of a material fact.

ii.   *Knowledge of Falsity*

Plaintiff argues that he meets the second element of knowledge of falsity because Plaintiff "alleges that Wells never had any intention of granting him a loan modification, HAMP or otherwise, and that Wells' statements that there was any other reason for denying him a modification was therefore misleading." (ECF No. 1-1 at 31, ¶ 92(c).) "Wells and its agents knew or should have known that Wells had no intention of granting Plaintiff a loan modification." (ECF No. 1-1 at 33, ¶ 92(e)). Therefore, Plaintiff alleged that Wells' agents made these statements either with the knowledge of their falsity or without "any reasonable ground for believing the statement[s] to be true." *Charnay*, 145 Cal. App. 4th at 184–85. As such, Plaintiff has pleaded the element of knowledge of falsity for intentional, or in the alternative negligent, misrepresentation.

iii.   *Intent to Induce Reliance*

As to the third element, intent to deceive and induce reliance, the complaint alleges that "Wells intended that Plaintiff rely on its false representations and promises in order to make more money servicing a distressed loan" (ECF No. 1-1 at 33, ¶ 92(f)) and that "by inducing Plaintiff into a practically incurable default, Wells stood to recover all of its fees first at the time of any foreclosure sale." (ECF No. 1-1 at 33, ¶ 92(f)). Plaintiff has met this element.

iv.   *Justifiable Reliance*

Plaintiff also alleges that he meets the justifiable reliance requirement because he relied on Wells's representations and the falsity of those representations was not readily ascertainable. (ECF No. 1-1 at 33, ¶ 92(g)). The Court agrees that these allegations are sufficient to meet the fourth element of justifiable reliance.

v.   *Resulting Damages*

Finally, Plaintiff meets the final element of damages because he alleges the

1    damages as a result of his reliance on Wells' promises were that "Plaintiff was induced into

2    entering a long process of seeking a loan modification that never occurred" and "[h]e incurred

3    penalties, fees and costs during the long attempt to modify the Subject Loan, as well as negative

4    credit reporting," which ultimately led to the foreclosure on the Subject Property.  (ECF No. 1-1

5    at 33, ¶¶ 92(h) & 94).  Thus, Plaintiff has met the standard articulated in Rule 9(b).

6            Based on the facts alleged in the Complaint, Plaintiff has adequately pled both

7    intentional and negligent misrepresentation.  As such, Defendants' motion to dismiss Plaintiff's

8    Fourth and Fifth Causes of Action is DENIED.

9            **e.   Wrongful Foreclosure (Counts VI)**

10            Plaintiff seeks to recover damages against Defendants for wrongful foreclosure, as

11   well as punitive damages for wrongful foreclosure.  (ECF No. 1-1 at 41–42, ¶¶ 114 & 116.)  The

12   gravamen of Plaintiff's argument is that breaks in the chain of title occurred and thus Real Estate

13   Mortgage Investment Conduit ("REMIC") lacked the authority to foreclose on the property.

14            Specifically, Plaintiff argues that a beneficiary trust is required to possess the deed

15   of trust within 90 days of the closing date of the trust in order to maintain status as a REMIC

16   (ECF No. 1-1 at 39, ¶ 108(c)).  Plaintiff further alleges that under 26 U.S.C. § 860G, HSBC was

17   not the rightful owner of the Subject Property when it was sold at the foreclosure sale because

18   HSBC did not possess the deed of trust within 90 days of the closing date of the deed of trust,

19   June 25, 2005.  (ECF No. 1-1 at 40, ¶¶ 108(e) and 109.)  Plaintiff asserts that pursuant to New

20   York Trust Law,[10] HSBC did not possess the deed of trust within 90 days of the closing of the

21   trust, and thus was not the rightful owner of the Subject Loan when it caused the Subject Property

22   to be sold at a non-judicial foreclosure sale on June 21, 2012.  (ECF No. 1-1 at 40, ¶ 110.)

23   Defendants argue that Plaintiff does not have standing to challenge the securitization process even

24   if their loans or deeds of trust are transferred to the trust after the specified closing date.  (ECF

25   No. 4 at 18–20.)  In response, Plaintiff argues that his standing derives from his own deed of trust

26   ---
     [10] Plaintiff alleges that the New York Trust Law is identified as the Operative Law of the Trust itself (Section 12.03

27   of the MSTA). (ECF No. 1-1 at 39–40, ¶ 108(d).)  The New York Trust Law states that, "[i]f the trust is expressed in
     the instrument creating the estate of the trustee, every sale, conveyance or other act of the trustee in contravention of
     the trust, except as authorized by this article and by any other provision of law, is void."  N.Y. Est. Powers & Trusts

28   Law § 7-2.4.

1     and seeks a construction of the term "sale" to prove that the loan was never "sold" to HSBC as

2     trustee for REMIC Trust, which purported to have owned Plaintiff's loan.  (ECF No. 6 at 20.)

3     The Court finds that Plaintiff's claims are the same arguments that this Court has

4     previously rejected.  *See Gutierrez v. Bank of Am., N.A.*, No. 2:14-CV-01246-TLN-AC, 2015

5     WL 925703, at *5 (E.D. Cal. Mar. 3, 2015).  This Court has continuously followed the majority

6     rule that a third party lacks standing to challenge a Pooling and Service Agreement ("PSA").  *See*

7     *id.*; *Gilbert v. Chase Home Fin.*, LLC, No. 1:13–CV–265 AWI SKO, 2013 WL 2318890, at *3

8     (E.D. Cal. May 28, 2013); *Elliot v. Mortgage Elec. Registration Sys.*, No. 12–CV–4370 YGR,

9     2013 U.S. Dist. LEXIS 61820, at *7–*10 (N.D. Cal. Apr. 25, 2013); *Sabherwal v. Bank of N .Y.*

10    *Mellon*, No. 11cv2874 WQH–BGS, 2013 U.S. Dist. LEXIS 2930, at *20–*21, 2013 WL 101407

11    (S.D. Cal. Jan. 7, 2013); *Dinh v. Citibank, N.A.*, No. SA CV 12–1502–DOC (RNBx), 2013 U.S.

12    Dist. LEXIS 2312, at *8–*11, 2013 WL 80150 (C.D. Cal. Jan. 7, 2013); *Ramirez v. Kings Mortg.*

13    *Servs.*, No. 1:12–cv–01109–AWI–SKO, 2012 U.S. Dist. LEXIS 160583, at *13–*14, 2012 WL

14    5464359 (E.D. Cal. Nov.8, 2012); *Armstrong v. Chevy Chase Bank, FSB*, No. 5:11–cv–05664

15    EJD, 2012 U.S. Dist. LEXIS 144125, at *6–*7, 2012 WL 4747165 (N.D. Cal. Oct. 3, 2012); *Hale*

16    *v. World Sav. Bank*, No. CIV 2:12–cv–1462–GEB–JFM, 2012 U.S. Dist. LEXIS 141917, at *17–

17    *18, 2012 WL 4675561 (E.D. Cal. Oct. 1, 2012); *Almutarreb v. Bank of N.Y. Trust Co., N.A.*, No.

18    C–12–3061 EMC, 2012 U.S. Dist. LEXIS 137202, at *3–*7, 2012 WL 4371410 (N.D. Cal. Sept.

19    24, 2012); *Armeni v. America's Wholesale Lender*, No. CV 11–8537 CAS (AGRx), 2012 WL

20    603242, at *3 (C.D. Cal. Feb. 24, 2012); *Junger v. Bank of Am.*, No. CV 11–10419 CAS (VBKx),

21    2012 U.S. Dist. LEXIS 23917, at *7–*8, 2012 WL 603262 (C.D. Cal. Feb. 24, 2012); *Bascos v.*

22    *Fed. Home Loan Mortgage Corp.*, No. CV 11–3968–JFW JCX, 2011 WL 3157063, at *6 (C.D.

23    Cal. July 22, 2011).  However, there are some courts that have held otherwise.  *See Glaski v.*

24    *Bank of America, N.A.*, 218 Cal. App. 4th 1079, 1083 (2013) (allowing a plaintiff to challenge the

25    validity of a foreclosure where the plaintiff alleged that the transfer of his deed of trust to the

26    WAMU Trust was void).

27    In light of the fact that the California Supreme Court has not spoken on this issue

28    and is currently scheduled to decide this matter in the case entitled *Yvanova v. New Century*

25

*Mortgage Corp.*, 226 Cal. App. 4th 495, 172 Cal. Rptr. 3d 104, *review granted and opinion superseded sub nom. Yvanova v. New Century Mortgage Corp.*, 331 P.3d 1275 (Cal. 2014), the Court defers judgment on Defendants' Motion to Dismiss Count Six of Plaintiff's complaint until the California Supreme Court has issued its ruling for *Yvanova*.[11]

### f.   **Conversion (Count VII)**

Plaintiff also seeks to recover damages against Defendants for conversion because Plaintiff alleges he made payments to Defendants when HSBC was not the true beneficiary. (ECF No. 1-1 at 42, ¶ 118.)  Plaintiff argues that HSBC had no legal right to collect Plaintiff's debt because HSBC had no legal right to the beneficial interest in the Subject Loan.  (ECF No. 1-1 at 42, ¶¶ 118–122.)  As such, Plaintiff contends that Defendants converted approximately seven years of payments from Plaintiffs without Plaintiffs' informed consent.  (ECF No. 1-1 at 43, ¶ 120.)  Because Plaintiff's claim for conversion depends on his securitization arguments, the Court will also defer judgment of Plaintiff's conversion cause of action.

### g.   **Unfair Competition (Count VIII)**

Plaintiff alleges a cause of action for unfair competition under California Business and Professions Code section 17200.  The statute states in relevant part that it concerns "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . ."  Cal. Bus. & Profs. Code § 17200 ("Section 17200").  Plaintiff alleges that Defendants' conduct was unlawful, unfair and fraudulent.  (ECF No. 1-1 at 43–44.)  Defendants argue that Plaintiff's claim is based on a rejected theory of law and fails because all of Plaintiff's other claims fail.[12]  (ECF No. 4 at 18–20.)  Because the Court has upheld several of Plaintiff's causes of action, Plaintiff's claim for unfair competition is also upheld.

The purpose of California's unfair competition law ("UCL") is to protect consumers as well as competitors by promoting fair competition for goods and services in

---

[11]  The California Supreme Court will decide whether "[i]n an action for wrongful foreclosure on a deed of trust securing a home loan, does the borrower have standing to challenge an assignment of the note and deed of trust on the basis of defects allegedly rendering the assignment void?"  *Yvanova*, 331 P.3d at 1275.

[12]  Defendants also argue that Plaintiff fails to plead the other claims with particularity to meet the UCL pleading standards.  (ECF No. 7 at n.1.)  However, the Court finds that Plaintiffs have pleaded breach of contract, promissory estoppel, negligence, intentional misrepresentation, and negligent misrepresentation with particularity sufficient to meet the UCL pleading standards.  *See Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1203 (9th Cir. 2001).

1  commercial markets. *Barquis v. Merch. Collection Ass'n*, 7 Cal. 3d 94, 110 (1972).  To that end,

2  the scope of the UCL is quite broad. *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 949 (2002).  A plaintiff

3  need only meet one of three criteria to state a claim for unfair competition. *South Bay Chevrolet*

4  *v. Gen. Motors Accept. Corp.*, 72 Cal. App. 4th 861, 878 (1999).  First, with respect to unlawful

5  acts, the California Supreme Court has held that Section 17200 "'borrows' violations of other

6  laws and treats these violations, when committed pursuant to business activity, as unlawful

7  practices independently actionable under 17200." *Farmers Ins. Exch.v . Super. Ct.*, 2 Cal. 4th

8  377, 383 (1992).  Next, a business practice may be deemed unfair, and thus, a violation of Section

9  17200, even if it is not otherwise illegal. *Cel–Tech Commc'ns, Inc. v. L.A. Cell. Tel. Co.*, 20 Cal.

10  4th 163, 180 (1999).  Unfair business practices include violations of established public policy,

11  and practices that are "immoral, unethical, oppressive, unscrupulous, or substantially injurious to

12  consumers." *Cmty. Asst. Recovery, Inc. v. Aegis Sec. Ins. Co.*, 92 Cal. App. 4th 886, 894 (2001).

13  Finally, a business practice may be deemed fraudulent in the context of Section 17200 if the

14  public is likely to be deceived. *Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144, 1167 (2000).

15        Plaintiff alleges that Defendants unlawfully violated California Civil Code section

16  1709 when they willfully deceived Plaintiff with the intent to induce him to alter his position

17  resulting in his injury.[13]  (ECF No. 1-1 at 43, ¶ 126.)  Plaintiff further alleges that Wells's

18  intentional and negligent representations qualify as unfair and fraudulent business practices.

19  (ECF No. 1-1 at 44, ¶ 127–29).  Because Plaintiff has adequately pled intentional and negligent

20  misrepresentation and Plaintiff rightly argues that these claims are unlawful, unfair, and

21  fraudulent, Plaintiffs allegations are sufficient enough to meet the requirements of Section 17200.

22        Thus, Plaintiff has sufficiently pleaded a violation of Section 17200, and

23  Defendants' motion to dismiss Plaintiff's Eighth Cause of Action is DENIED.

24  ///

25  ///

26  ///

---

27  [13] Plaintiff also alleges conversion and a violation of California Civil Code section 2924 related to his securitization claims are unlawful and unfair.  (ECF 1-1 at 43, ¶ 126, 127.)  However, the Court will not consider these arguments until the California Supreme Court has issued its ruling on *Yvanova*.

28

h. **Unjust Enrichment (Count IX)**

Plaintiff asserts a cause of action for unjust enrichment against Defendants.  (ECF No. 1-1 at 45.)  Defendants argue that unjust enrichment is not a valid cause of action in California.  (ECF No. 4 at 20.)  The Court agrees and finds that unjust enrichment is not a cause of action in California when another cause of action is available.

California courts do not appear to recognize a separate claim for relief of "unjust enrichment."  *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010) (denying that a separate claim for relief for unjust enrichment exists arising from allegations that a doctor billed unsubsidized rates to uninsured patients); *see generally*, 1 B.E. Witkin, Summary of California Law, Contracts, § 1013 (10th ed. 2014 supp.).  Instead, unjust enrichment is a general principle underlying various legal doctrines and remedies.  *Dinosaur Dev., Inc. v. White*, 216 Cal. App. 3d 1310, 1315 (1989) (holding that a cause of action for unjust enrichment did not exist as a separate claim for relief based on plaintiff's construction of an access road which benefited the defendant but to which the defendant did not contribute.  It is the result of a failure to make restitution where it is equitable to do so); *Lauriedale Assocs., Ltd. v. Wilson*, 7 Cal. App. 4th 1439, 1448 (1992) (holding that it would be inequitable to maintain an action of restitution by party who breached fiduciary duty against those harmed by the party's breach).

Plaintiff points to cases where the California Supreme Court "either explicitly or implicitly recognize[d] Unjust Enrichment as a cause of action."  (ECF No. 6 at 25.)  However, only one of these cases supports Plaintiff's assertion and that case is almost twenty-years old in contrast to more recent California Supreme Court decisions which do not recognize unjust enrichment as a cause of action where another remedy is available to the plaintiff.  *See Ghirardo v. Antonioli*, 14 Cal. 4th 39, 52 (1996) (relief for unjust enrichment is available).  *Compare with Huskinson & Brown, LLP v. Wolf*, 32 Cal. 4th 453, 457 (2004) (does not acknowledge the cause of action for unjust enrichment); *Snowney v. Harrah's Entm't, Inc.*, 35 Cal. 4th 1054, 1068 (2005) (same); *Phillippe v. Shapell Indus.*, 43 Cal. 3d 1247, 1263 (1987) (same).  California district courts have consistently followed the more recent California Supreme Court decision and "held that California law does not recognize a cause of action for unjust enrichment, so long as another

28

cause of action is available that permits restitutionary damages."[14]  *In re ConAgra Foods Inc.*, 908 F. Supp. 2d 1090, 1114 (C.D. Cal. 2012); *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1099–100 (N.D. Cal. 2007).

As discussed, Plaintiff has remedies other than unjust enrichment available for the alleged violations, thus making unjust enrichment unnecessary and unavailable.  As such, Plaintiff's Ninth Causes of Action is DISMISSED WITHOUT PREJUDICE.

i.   **Equitable Accounting (Count X)**

Plaintiff brings a cause of action for equitable accounting.  (ECF No. 1-1 at 45.) Defendants argue that Plaintiff cannot meet the elements for an equitable accounting cause of action.  (ECF No. 4 at 14.)

An action for an accounting may be brought to compel the defendant to account to the plaintiff for money or property (1) where a fiduciary relationship exists between the parties, or (2) where, even though no fiduciary relationship exists, the accounts are so complicated that an ordinary legal action demanding a fixed sum is impracticable.  *Brea v. McGlashan*, 3 Cal. App. 2d 454, 460 (1934) ("[a] cause of action for an accounting requires a showing that a relationship exists between the plaintiff and defendant that requires an accounting, and that some balance is due the plaintiff that can only be ascertained by an accounting"); *see Teselle v. McLoughlin*, 173 Cal. App. 4th 156, 179 (2009).  "An action for accounting is not available where the plaintiff alleges the right to recover a sum certain or a sum that can be made certain by calculation." *Teselle*, 173 Cal. App. 4th at 179.

Plaintiffs do not allege that Defendants owe them a fiduciary duty and instead argue that "Wells is indebted to Plaintiff for the fees and penalties it received upon sale of the Subject Property, the exact calculation of those amounts being extremely complicated at this time." (ECF No. 1-1 at 47, ¶ 142.)  However, these fees and penalties are dependent upon Plaintiff's securitization theory.  (ECF No. 6 at 26.)

As such, the Court hereby defers judgment on Defendants' motion to dismiss

---

[14] More recent California appellate courts also seem to follow this reasoning.  *See Durell*, 183 Cal. App. 4th at 1370; *see generally*, 1 B.E. Witkin, Summary of California Law, Contracts, § 1013 (10th ed. 2014 supp.).

Count Ten until the California Supreme Court rules on this issue in *Yvanova*.

## IV. CONCLUSION

For the reasons set forth above, the Court hereby GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss Plaintiff's Complaint (ECF No. 4).  The Court orders as follows:

1. Defendants' Motion to Dismiss as to COUNT I is DENIED;

2. Defendants' Motion to Dismiss as to COUNT II is DENIED;

3. Defendants' Motion to Dismiss as to COUNT III is DENIED;

4. Defendants' Motion to Dismiss as to COUNTS IV and V is DENIED;

5. The Court defers judgment as to COUNTS VI and VII;

6. Defendants' Motion to Dismiss as to COUNT VIII is DENIED;

7. Defendants' motion to dismiss COUNT IX is GRANTED and this count is therefore DISMISSED with leave to amend; and

8. The Court defers judgment as to COUNT X.

For the causes of action on which the Court has deferred judgment, the Court requests supplemental briefing limited to ten (10) pages to be filed with this Court within thirty days (30) after the California Supreme Court issues its decision in *Yvanova*.

IT IS SO ORDERED.

Dated:  April 23, 2015

Troy L. Nunley
United States District Judge