UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSH MEIXNER,<br><br>            Plaintiff,<br><br>    v.<br><br>WELLS FARGO BANK, N.A., SUCCESSOR BY MERGER TO WELLS HOME MORTGAGE, INC.; HSBC BANK USA, N.A., AS TRUSTEE FOR GSAA HOME EQUITY TRUST 2005-7,<br><br>            Defendant. | No.  2:14-cv-02143-TLN-CKD<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |

This matter is before the Court pursuant to Defendants' Wells Fargo Bank, N.A., Successor by Merger to Wells Fargo Home Mortgage, Inc. ("Wells") and HSBC Bank USA, N.A., as Trustee for GSAA Home Equity Trust 2005-7's ("HSBC") (collectively "Defendants") Motion to Dismiss Plaintiff's Complaint.  (Def. s' Mot. to Dismiss, ECF No. 4.)  Plaintiff Josh Meixner ("Plaintiff") filed an opposition to Defendants' motion.  (Pl.'s Opp'n, ECF No. 6.)  The Court deferred judgment on Defendants' Motion to Dismiss on Counts VI (wrongful foreclosure), VII (conversion), and X (equitable accounting) of the Complaint until the California Supreme Court issued its ruling in *Yvanova v. New Century Mortgage Corp.* (Order, ECF No. 10)  After careful consideration, and for the reasons set forth below, the Court hereby GRANTS

1  Defendants' Motion to Dismiss on the wrongful foreclosure, conversion, and equitable
2  accounting counts.

### I.   FACTUAL BACKGROUND

In or about January 2005, Plaintiff entered into a purchase money mortgage loan with Wells for $329,855.00 which was evidenced by a Note and was secured by a Deed of Trust on the Subject Property.  (Comp. ECF No. 1-1 at 11, ¶ 13.)   In or about September 2008, Plaintiff began to have difficulty making his monthly payments.  (ECF No. 1-1 at 11, ¶ 14.)  Plaintiff contacted Wells about a loan modification, and a Wells representative allegedly instructed Plaintiff to stop making loan payments in order to be considered for a Home Affordable Modification Program ("HAMP") loan modification.  (ECF No. 1-1 at 11, ¶ 14.)  In or about March 2009, Plaintiff, represented by Pro City Mortgage,[1] began the loan modification process with Wells. (ECF No. 1-1 at 12, ¶ 15.)  On or about July 22, 2009, Wells caused to be recorded a Notice of Default with the Sacramento County recorder stating that $16,593.81 was past due on Plaintiff's loan.  (ECF No. 1-1 at 12, ¶ 16.)

In or about September 2009, Kelly Robert from Pro City Mortgage informed Plaintiff that she had spoken with Wells and that Wells had told her that Plaintiff had been approved for HAMP.  (ECF No. 1-1 at 12, ¶ 17.)  Ms. Robert further informed Plaintiff that she did not have any specific details regarding the loan modification because Wells was awaiting final approval. (ECF No. 1-1 at 12, ¶ 17.)  On or about October 23, 2009, Ivy Nagel, Plaintiff's negotiator from Pro City Mortgage, informed Plaintiff that he had been approved for a loan modification and that he would receive a package from Wells within seven to ten days. (ECF No. 1-1 at 12, ¶ 18.) Nagel allegedly informed Plaintiff that the terms, as she understood them from Wells, were that Plaintiff's loan was to be modified to a five-year fixed interest rate, probably around 2%, and then increase 1% per year after five years, but not to exceed 6%.  Nagel allegedly informed Plaintiff

---

[1] In or about March 2009, Plaintiff engaged the services of Pro City Mortgage, a company that claimed to specialize in securing loan modification for its clients. Pro City Mortgage was hired to represent Plaintiff in the loan modification process. (ECF 1-1 at 12, ¶ 15.) In or about August 2010, Plaintiff informed Wells that Pro City Mortgage was no longer authorized to represent him. (ECF 1-1 at 16, ¶ 35.)

that his modification would result in payments ranging from $1,600 to $1,700 per month.  (ECF No. 1-1 at 12, ¶ 18.)

About one week later, Plaintiff allegedly spoke with a representative from Pro City Mortgage who informed Plaintiff that Wells was denying his application for loan modification due to "net negative income."  (ECF No. 1-1 at 12, ¶ 19.)  On or about December 14, 2009, Plaintiff spoke with Lisa Walker from Pro City Mortgage who told Plaintiff that she learned that Plaintiff was still in HAMP review, but his file was taking longer than expected.  (ECF No. 1-1 at 12, ¶ 20.)

On or about December 30, 2009, Laurie Adomo from Pro City Mortgage informed Plaintiff that Wells required supplemental income information for Plaintiff's fiancée, Brooke Petersen, because Wells was aware that Ms. Petersen was living in the Subject Property with Plaintiff.  (ECF No. 1-1 at 13, ¶ 21.)  According to Adomo, Plaintiff was qualified for HAMP and his modification would be approximately $2,058.40 per month on a trial basis, but his file needed to go through one more department at Wells.  (ECF No. 1-1 at 13, ¶ 21.)  In addition, Wells informed Adomo that if Plaintiff completed three months of trial payments, his modification would be finalized and his first payment would be due February 1, 2010.  (ECF No. 1-1 at 13, ¶ 21.)  On or about December 31, 2009, Wells mailed Plaintiff a HAMP Trial Period Plan ("TPP"). (ECF No. 1-1 at 13, ¶ 22; ECF No. 1-1 at 50.)  Plaintiff alleges that the TPP provided that if Plaintiff complied with the terms of the agreement and qualified, Wells would provide Plaintiff with a permanent loan modification agreement.  (ECF No. 1-1 at 13, ¶ 22, 50.)

On or about March 19, 2010, Walter Pajares at Pro City Mortgage informed Plaintiff again that Wells would make Plaintiff's modification permanent after Plaintiff made his third TPP payment.  (ECF No. 1-1 at 14, ¶ 28.)  Pajares advised Plaintiff to continue making additional modified payments until the modification was finalized.  (ECF No. 1-1 at 14, ¶ 28.)  On or about June 17, 2010, Plaintiff called Wells (866-359-1569), and a representative from Wells told Plaintiff that there was no time frame for finalization but to continue making payments of $2,058.40 per month.  (ECF No. 1-1 at 14, ¶ 29.)

On or about June 23, 2010, Plaintiff allegedly spoke with Howard Welling, who identified himself as a Wells representative. (ECF No. 1-1 at 14, ¶ 30.) Plaintiff contends that Welling advised Plaintiff to continue making modified trial payments, that the loan modification would be finalized soon after, and that the final monthly payment amount would be 31% of Plaintiff's gross monthly wages. (ECF No. 1-1 at 14, ¶ 30.) Welling also stated that Wells had validated all of Plaintiff's information and provided documents, that the modification had gone through two levels of review, and that his file had been sent to underwriting for final approval. (ECF No. 1-1 at 14, ¶ 30.) Welling further stated that while a decision was about three to five weeks away, it looked "good." (ECF No. 1-1 at 14, ¶ 30.) Finally, Welling allegedly confirmed that Plaintiff had been in HAMP review since December 31, 2009, and that Plaintiff's file "definitely" showed that his modification would be 31% of his gross income. (ECF No. 1-1 at 14, ¶ 30.)

On or about July 28, 2010, a Wells representative, "Abed," informed Plaintiff that his HAMP loan modification had been denied on July 27, 2010, because he had an income deficit of $1,895.22. (ECF No. 1-1 at 14, ¶ 31.) Abed allegedly explained that while Wells allowed for a deficit under HAMP, that deficit could be no more than $800.00 to $1,000.00. (ECF No. 1-1 at 14, ¶ 31.) However, Abed told Plaintiff that if he filed for Chapter 7 bankruptcy to eliminate his credit card debt, Plaintiff would be approved for a loan modification. (ECF No. 1-1 at 14, ¶ 31.)

On or about August 3, 2010, Plaintiff alleges that a representative of Wells's loss mitigation department (800-416-1472) informed Plaintiff that Wells had instituted a new procedure with respect to loan modifications and that Plaintiff needed to send in a new HAMP application and supporting documentation with a three-day turnaround on the application. (ECF No. 1-1 at 16, ¶ 35.) Plaintiff inquired as to the method Wells utilized in determining his income, and whether Wells considered his gross monthly income or his net monthly income. (ECF No. 1-1 at 16, ¶ 35.) The representative, who stated he was a HAMP specialist, told Plaintiff that Wells did not have HAMP guidelines regarding deficit income and that Plaintiff was given incorrect information. (ECF No. 1-1 at 16, ¶ 35.) On or about August 6, 2010, Wells allegedly informed

4

Plaintiff that his file was still in review and that the process would take 45 days. (ECF No. 1-1 at 16, ¶ 35.)

Plaintiff allegedly called Wells's Loss Mitigation department again on or about August 20, 2010, and spoke with "Carol," who told Plaintiff that he was still in HAMP review and that he should continue making TPP payments. (ECF No. 1-1 at 16, ¶ 36.) Carol also informed Plaintiff that she would send an escalation email to a "team of supervisors" regarding his file, but that Plaintiff should send in updated documents, a hardship letter, financial worksheet, and updated paystubs. (ECF No. 1-1 at 16, ¶ 36.) Plaintiff alleges he sent in all documents as requested via fax to (866) 359-7363. (ECF No. 1-1 at 16, ¶ 36.) On or about September 2, 2010, Plaintiff called Wells's bankruptcy department (800-274-7025) to inquire about his options, as a sale date was nearing. (ECF No. 1-1 at 16, ¶ 37.) Wells's representative allegedly advised Plaintiff that he was approved for HAMP but implied that he should probably file for bankruptcy in order to eliminate his credit card debt as that was hindering his final approval. (ECF No. 1-1 at 16, ¶ 37.)

On or about September 14, 2010, Plaintiff received a returned payment from Wells for $2,215.11, representing his previous TPP payment of $2,058.40 and an additional $156.71. (ECF No. 1-1 at 17, ¶ 38.) Plaintiff called Wells the next day, on or about September 15, 2010, and allegedly spoke with "Tinika" at collections. (ECF No. 1-1 at 17, ¶ 38.) Tinika informed Plaintiff that his file was no longer active, and that the house would be sold on October 26, 2010. (ECF No. 1-1 at 17, ¶ 38.) On or about September 28, 2010, Plaintiff called Wells and spoke with "Kimberly" (877-335-1909, extension 85549). (ECF No. 1-1 at 17, ¶ 39.) Kimberly allegedly told Plaintiff that he was still in review and that the foreclosure sale was postponed to November 29, 2010, but he needed to send in a new IRS Form 4506-T for HAMP review.[2] (ECF No. 1-1 at 17, ¶ 39.) Kimberly informed Plaintiff that if he filed for bankruptcy, they could not sell the Subject Property while the bankruptcy was pending. (ECF No. 1-1 at 17, ¶ 39.) However, Kimberly advised that he should try a HAMP loan modification first. (ECF No. 1-1 at 17, ¶ 39.)

---

[2] An IRS Form 4506-T is used to order a transcript of tax return or other return information free of charge.

On or about February 15, 2011, Wells's loss mitigation department (800-416-1472) allegedly told Plaintiff that his file was active in foreclosure but there was no sale date noticed. (ECF No. 1-1 at 17, ¶ 41.) The representative allegedly told Plaintiff that they had received his hardship letter, paystubs, and financial worksheet and that Plaintiff was "pre-approved" for HAMP again. (ECF No. 1-1 at 17, ¶ 41.) The representative told Plaintiff that he simply needed to send in a Dodd-Frank certification and a letter from Plaintiff's fiancée, Ms. Petersen, confirming that she was able to contribute $1,200.00 per month towards the monthly mortgage payments. (ECF No. 1-1 at 17, ¶ 41.) On or about February 22, 2011, Plaintiff called Wells and spoke with Connie Salgado, a self-identified Wells loan processor. (ECF No. 1-1 at 17, ¶ 42.) Salgado explained the review process to Plaintiff, including how information is inputted into a Treasury Department formula. (ECF No. 1-1 at 17–18, ¶ 42.) Salgado informed Plaintiff that all of his paperwork was submitted and the process should take two to three weeks—about a week for initial approval, then another week or so to get second level approval from "the investor," Goldman Sachs. Salgado told Plaintiff that he was "20 months behind in payments" but that he had "a 98% chance" of being approved for the loan modification. (ECF No. 1-1 at 17–18, ¶ 42.)

On or about March 8, 2011, Plaintiff called Wells's bankruptcy department who told Plaintiff that he was still under review, but that there was a foreclosure sale date of April 5, 2011 showing. (ECF No. 1-1 at 18, ¶ 43.) Plaintiff was again asked to send in all financial documents, IRS Form 4506-T, Petersen's proof of income, and bank statements. (ECF No. 1-1 at 18, ¶ 43.) On or about March 17, 2011, Plaintiff spoke with Salgado again. (ECF No. 1-1 at 18, ¶ 44.) Salgado allegedly stated that all she needed was Petersen's 2009 tax return, but that Plaintiff's file "looked good" for a loan modification "unless the investor felt the he was too far behind on his payments." (ECF No. 1-1 at 18, ¶ 44.) On or about March 21, 2011, Salgado told Plaintiff that he was denied for a loan modification. (ECF No. 1-1 at 18, ¶ 45.)

From about April 2011 until about November 2011, Plaintiff spoke with various representatives of Wells regarding his denial for a permanent loan modification and was informed that he did not qualify due to the net present value ("NPV") calculations. (ECF No. 1-1 at 18–19,

6

¶¶ 46–50.)  On or about June 21, 2012, Wells caused the Subject Property to be sold at a non-judicial foreclosure sale.  (ECF No. 1-1 at 19, ¶ 50.)

Based on Plaintiff's information and belief, Plaintiff alleges the following: Wells was required to follow the Federal Department of the Treasury's servicing guidelines for HAMP loan modifications when offering TPPs and loan modifications in order to receive Troubled Asset Relief Program ("TARP") funds.  (ECF No. 1-1 at 13, ¶ 23(a).)  Under the HAMP servicing guidelines for Fannie Mae in effect at the time the TPP was offered, Plaintiff asserts that he was deemed eligible for a HAMP loan modification because a TPP could only be offered once eligibility was confirmed.  (ECF No. 1-1 at 13, ¶ 22(b).)  Plaintiff further alleges that Abed's representation regarding Plaintiff's gross monthly income was incorrect and untrue because Wells's calculation of Plaintiff's income did not include reimbursement for mileage or Petersen's income.[3]  (ECF No. 1-1 at 15, ¶ 32.)  In addition, Plaintiff contends that Wells already calculated a trial modification amount and had determined that it was more profitable to modify the Subject Loan under HAMP than to foreclose upon the Subject Property.  (ECF No. 1-1 at 13, ¶ 23(c)–(d).)  Plaintiff made all three payments required under the TPP on time.  (ECF No. 1-1 at 14, ¶ 25–27.)  For these reasons, Plaintiff believes that he was entitled to a permanent loan modification under the TPP.  (ECF No. 1-1 at 14, ¶ 24.)

Plaintiff brings this suit against Defendants Wells, HSBC, and DOES 1–50 for: 1) Breach of Contract; 2) Promissory Estoppel; 3) Negligence; 4) Intentional Misrepresentation; 5) Negligent Misrepresentation; 6) Wrongful Foreclosure; 7) Conversion; 8) Violation of Business and Professions Code section 17200; 9) Unjust Enrichment; and 10) Equitable Accounting.  The Court denied Defendants' Motion to Dismiss on Counts I (Breach of Contract), II (Promissory Estoppel), III (Negligence), IV – V (Intentional and Negligent Misrepresentation), and VIII (Unfair Competition).  (Order, ECF No. 10)  The Court dismissed without prejudice Count IX (Unjust Enrichment).  (Order, ECF No. 10)

---

[3]  Petersen's income refers to the income made by Plaintiff's aforementioned fiancée, Brooke Petersen, who was living with Plaintiff in the Subject Property.

The Court declined to rule on Counts VI (Wrongful Foreclosure), VII (Conversion), and X (Equitable Accounting) until the California Supreme Court decided *Yvanova v. New Century Mortg. Corp. Yvanova v. New Century Mortg. Corp.*, 62 Cal. 4th 919, 931 (Cal. 2016). The parties have submitted briefing as to how this decision impacts the causes of action before this Court.

## II.   STANDARD OF LAW

Federal Rule of Civil Procedure 8(a) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Under notice pleading in federal court, the complaint must "give the defendant fair notice of what the claim . . . is and the grounds upon which it rests." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted). "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

On a motion to dismiss, the factual allegations of the complaint must be accepted as true. *Cruz v. Beto*, 405 U.S. 319, 322 (1972). A court is bound to give plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *Retail Clerks Int'l Ass'n v. Schermerhorn*, 373 U.S. 746, 753 n.6 (1963). A plaintiff need not allege "'specific facts' beyond those necessary to state his claim and the grounds showing entitlement to relief." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. 544, 556 (2007)).

Nevertheless, a court "need not assume the truth of legal conclusions cast in the form of factual allegations." *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986). While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the

elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, it is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged[.]" *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

Ultimately, a court may not dismiss a complaint in which the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 697 (quoting *Twombly*, 550 U.S. at 570). Only where a plaintiff fails to "nudge[] [his or her] claims . . . across the line from conceivable to plausible[,]" is the complaint properly dismissed. *Id.* at 680. While the plausibility requirement is not akin to a probability requirement, it demands more than "a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. This plausibility inquiry is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

In ruling upon a motion to dismiss, the court may consider only the complaint, any exhibits thereto, and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201. *See Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988); *Isuzu Motors Ltd. v. Consumers Union of United States, Inc.*, 12 F. Supp. 2d 1035, 1042 (C.D. Cal. 1998).

If a complaint fails to state a plausible claim, " '[a] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.' " *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 484, 497 (9th Cir. 1995)); *see also Gardner v. Marino*, 563 F.3d 981, 990 (9th Cir. 2009) (finding no abuse of discretion in denying leave to amend when amendment would be futile). Although a district court should freely give leave to amend when justice so requires under Rule 15(a)(2), "the court's discretion to deny such leave is 'particularly broad' where the plaintiff has previously amended its

complaint[.]" *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 520 (9th Cir. 2013) (quoting *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 622 (9th Cir. 2004)).

### III. ANALYSIS

#### A. Wrongful Foreclosure (Count VI)

Plaintiff alleges that on September 10, 2009, Wells attempted to transfer the Deed of Trust on his property to HSBC but claims that this assignment was void. (ECF No. 1-1 at 40, ¶¶ 108(e) & 109.) According to Plaintiff, "under 26 U.S.C. §860G, the BENEFICIARY Trust was required to possess the Deed of Trust to the Subject Loan within 90 days of the Closing Date of the Trust (June 25, 2005), as set forth in the MSTA in order to maintain the Trust's status as a REMIC."[4] (ECF No. 1-1 at 39, ¶ 108(c).) Plaintiff reasons that because the transfer occurred after 90 days of the closing date, HSBC "did not possess the Deed of Trust to the Subject Property," and did not have the legal right to foreclose on the Subject Property. (ECF No. 1-1 at 40, ¶ 109.) Additionally, Plaintiff alleges that the assignment of the Deed of Trust was void under New York Trust Law "because of the failure of Defendants to abide by the mandates of the Internal Revenue Code with respect to the formation of REMIC trusts."[5] (ECF No. 1-1 at 40, ¶ 110.) Therefore, Plaintiff claims "that the late transfer violated federal law." (Pl.'s Suppl. Br., ECF No. 18 at 3.)

*Yvanova* held that a Plaintiff has standing where a transfer is void, not voidable. *Yvanova v. New Century Mortg. Corp.*, 62 Cal. 4th 919, 931 (Cal. 2016). Defendants assert that while the California Supreme Court in *Yvanova* explains that a different rule applies when an assignment is merely voidable and not void, that court expressed no opinion as to whether a post-closing date transfer into a New York securitized trust is void or voidable. (ECF No. 17 at 2.) Defendants argue that this Court should follow the holding in *Rajamin v. Deutsche Bank National Trust Co.*

---

[4]   REMIC stands for "real estate mortgage investment conduit," which facilitates the issuance of mortgage-backed securities by setting out minimum requirements that entities or taxpayers must meet in order to qualify. 26 U.S.C. § 860(a)–(g).

[5]   Plaintiff alleges that the New York Trust Law is identified as the Operative Law of the Trust itself (Section 12.03 of the MSTA). (ECF No. 1-1 at 39–40, ¶ 108(d).) The New York Trust Law states that, "[i]f the trust is expressed in the instrument creating the estate of the trustee, every sale, conveyance or other act of the trustee in contravention of the trust, except as authorized by this article and by any other provision of law, is void." N.Y. Est. Powers & Trusts Law § 7-2.4.

and find that a post-closing date transfer is not void, only voidable. *Rajamin v. Deutsche Bank Nat. Trust Co.*, 757 F.3d 79, 87–90 (2d Cir. 2014); (ECF No. 17. at 4.) Defendants reason that because *Rajamin* is decided by the United States Court of Appeals for the Second Circuit, this Court should defer on questions of state law to the interpretation of the Court of Appeals for the Circuit in which the State is located. (ECF No. 17 at 4.) Therefore, Defendants argue that Plaintiff does not have standing to bring his claim because "late transfers, such as the Plaintiff alleges here, are merely voidable," not void under the New York statute. (Defs.' Suppl. Br., ECF No. 17 at 3.) This Court agrees.

"[Wrongful foreclosure] is an equitable action to set aside a foreclosure sale, or an action for damages resulting from the sale, on the basis that the foreclosure was improper." *Sciarratta v. U.S. Bank Natl. Assn.*, D069439, 2016 WL 2941194 (Cal. App. 4th Dist. May 18, 2016). "A trustee or mortgagee may be liable to the trustor or mortgagor for damages sustained where there has been an illegal, fraudulent, or willfully oppressive sale of property under the power of sale contained in the mortgage or deed of trust." *Munger v. Moore*, 11 Cal. App. 3d 1, 7 (1970); *see also Alvarado v. Bank of America, N.A.*, No. CV F 12–2078 LJO GSA, 2013 WL 28584, at *9 (E.D. Cal. 2013). Under California law, "a borrower [has] standing to challenge an assignment of her note and deed of trust on the basis of defects allegedly rendering the assignment void." *Morgan v. Aurora Loan Services*, LLC, No. 14–55203, 2016 WL 1179733, at *2 (9th Cir. March 2016) (citing *Yvanova v. New Century Mortg. Corp.*, 62 Cal. 4th 919, 931 (Cal. 2016)). However, a borrower does not have standing to challenge defects in trust assignments that are merely voidable. *Morgan*, No. 14–55203 at *3; *Yvanova*, 62 Cal. 4th at 939. As the California Supreme Court stated, "[w]hen an assignment is merely voidable, the power to ratify or avoid the transaction lies solely with the parties to the assignment" and consequently, a plaintiff who sets forth a claim on defects within the assignment that render it voidable is attempting to "assert an interest belonging solely to the parties to the assignment rather than to herself." *Id.* at 936; *see also Lundy v. Selene Finance, LP*, Case No. 15-cv-05676-JST, 2016 WL 1059423, at *9 (N.D. Cal. March, 17, 2016). Thus, because New York Law governs the formation of the Trust, the

1    Court turns to New York Law to determine whether a late assignment is void or merely voidable.

2    Plaintiff relies on the court's literal interpretation of the New York statute in *Glaski v.
3    Bank of America, N.A.* where the California Fifth District Court of Appeal determined the
4    assignment of the Deed of Trust more than 90 days after the closing date was void. *Glaski v.
5    Bank of America, N.A.*, 218 Cal. App. 4th 1079, 1097 (2013). The court stated that "applying the
6    statute to void the attempted transfer is justified because it protects the beneficiaries… from the
7    potential adverse tax consequence of the trust losing its status as a REMIC trust under the Internal
8    Revenue Code." *Id.* In response, Defendants argue that even though *Glaski* recognized that other
9    courts do not literally interpret the word "void" in the New York statute, the court ruled in
10   contravention of other courts' interpretations "based on its own evaluation of potentially adverse
11   tax consequences of a post-closing transfer." (ECF No. 17 at 3.) Additionally, Defendants argue
12   that, since *Glaski*, the United States Court of appeals for the Second Circuit has "squarely held
13   that a post-closing-date-transfer is not void, but only voidable." *Id.*

14   This Court has previously found that *Glaski* is "an outlier and not widely accepted law."
15   *Gutierrez v. Bank of Am., N.A.*, No. 2:14-CV-01246-TLN-AC, 2015 WL 925703, at *5 (E.D. Cal.
16   Mar. 3, 2015).; See also *Pratap v. Wells Fargo Bank, N.A.*, No. 12–cv–06379–MEJ, 2014 WL
17   3884413, at *5 n. 4 (N.D. Cal. Aug.7, 2014); *Snell v. Deutsche Bank Nat. Trust Co.*, No. 2:13–
18   cv–02178–MCE, 2014 WL 325147, at *4 (E.D. Cal. Jan.29, 2014); *Surbramani v. Wells Fargo
19   Bank N.A.*, No. C 13–1605 SC, 2013 WL 5913789, at *3 (N.D. Cal. Oct.31, 2013); *Newman v.
20   Bank of New York Mellon*, No. 1:12–CV–1629 AWI, 2013 WL 5603316, at *3 (E.D. Cal. Oct.11,
21   2013); *Diunugala v. JP Morgan Chase Bank, N.A.*, No. 12CV2106–WQH–NLS, 2013 WL
22   5568737, at *8 (S.D. Cal. Oct.3, 2013). Therefore, because *Yvanova* does not express an opinion
23   as to whether a post-closing date transfer is void or voidable, the Court chooses to follow the
24   Ninth Circuit's ruling in *Morgan* and finds that "an act in violation of a trust is voidable—not
25   void—under New York law," and, thus, the Plaintiff lacks standing. *Morgan*, No. 14–55203, at
26   *2; *see also Rajamin v. Deutsche Bank Nat. Trust Co.*, 757 F.3d 79, 87–90 (2d Cir. 2014) (finding
27   that generally New York authority finds that "any failure to comply with the terms" of the

28

pooling servicing agreements does not render the "acquisition of plaintiffs' loans and mortgages void" because "[u]nder New York law, unauthorized acts by trustees are generally subject to ratification by the trust beneficiaries"). Accordingly, the Court concludes that Plaintiff does not have standing to bring a wrongful foreclosure claim based on a defective violation of his trust pursuant to New York law against Defendants.

Therefore, Defendants' Motion to Dismiss Plaintiff's Sixth Cause of Action is GRANTED.

B. Conversion (Count VII)

Plaintiff alleges he "paid a substantial sum of money to Wells and [HSBC] from 2005 through 2010 on a monthly basis pursuant to false representations made to him by [HSBC]." (ECF No. 1-1 at 42, ¶ 118.) Plaintiff argues that he "would not have consented to [HSBC] and Wells taking his money as payment on the Subject Loan had he known at the time that [HSBC] did not own the beneficial interest in the Subject Loan based on the void assignment of the beneficial interest under the Deed of Trust in 2009." (ECF No. 1-1 at 42, ¶ 119.) As such, Plaintiff asserts that "[d]espite having no legal right to service the loan or benefit from the payments made, Defendants have taken approximately seven years of payments from Plaintiff." (ECF No. 1-1 at 43, ¶ 122.) Plaintiff seeks to recover damages against Defendants for the alleged wrongful conversion of his personal property, money. Defendants argue that Plaintiff's conversion claim fails because it arises from his meritless theory of an allegedly void assignment from Wells to HSBC. (ECF No. 7 at 13.)

"Under California law, conversion is the wrongful exercise of dominion over another's personal property in denial of or inconsistent with the rights in the property." *In re Emery*, 317 F.3d 1064, 1069 (9th Cir. 2003). "The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." *Lee v. Hanley*, 61 Cal. 4th 1225. 1240 (Cal. 2015). Only personal property and not real property can be converted. *Munger v. Moore*, 11 Cal. App. 3d 1, 7 (1970). "When a plaintiff alleges the defendant converted money, the plaintiff must

1  specifically identify the sum of money converted, and allege that he had a right to possess it when
2  the defendant converted it." *Anderson v. Wells Fargo Bank, N.A.*, No. C 15-04683 JSW, 2016
3  WL 1446768, at *3 (N.D. Cal. Apr. 13, 2016); s*ee also Haigler v. Donnelly*, 117 P.2d 331, 335
4  (Cal. 1941); *Baxter v. King*, 253 P. 172, 172 (Cal. 1927) (both *Haigler* and *Baxter* are cited by
5  *Anderson*).

6        Plaintiff's conversion claim "is based on the allegations that Defendants did not own the
7  subject loan when [they] demanded payment on the loan." (ECF No. 18 at 5.)  As discussed
8  above, this Court does not find that the assignment was void, but merely voidable.  Plaintiff has
9  not alleged any facts that would lead this Court to believe that the parties to the Trust have
10 attempted to void the transfer.  Thus, Defendants had a legal right to continue collecting payments
11 from the Plaintiff, and the Court finds no wrongful action.  Therefore, Defendants' Motion to
12 Dismiss Plaintiff's Seventh Cause of Action is GRANTED.

13       C.  <u>Equitable Accounting (Count X)</u>

14       Plaintiff alleges that Defendants "induced Plaintiff to become delinquent on his payments
15 and essentially put himself into default in order to engage in the modification process." (ECF No.
16 1-1 at 47, ¶ 142.)  Plaintiff argues that Defendants were "able to collect fees and penalties which
17 … would have been forgiven upon permanent modification had Wells not breached the written
18 TPP and/or its promise to permanently modify the Subject Loan." *Id.*  As such, Plaintiff asserts
19 that Defendants are "indebted to Plaintiff for the fees and penalties it received upon sale of the
20 Subject Property" but that the calculations of those amounts are too complicated and require
21 accounting. *Id.*  Defendants argue that they do not owe Plaintiff a fiduciary duty and that the
22 Complaint does not allege any facts showing the Defendants owe funds to Plaintiff. (ECF No. 4
23 at 21.) Alternatively, Defendants argue that Plaintiff's equitable accounting claim arises from
24 Plaintiff's misapplied theory that the "assignment of his loan to HSBC was allegedly void."
25 (ECF No. 17 at 3.)

26       An action for an accounting may be brought to compel the defendant to account to the
27 plaintiff for money or property (1) where a fiduciary relationship exists between the parties, or (2)
28

where, even though no fiduciary relationship exists, the accounts are so complicated that an ordinary legal action demanding a fixed sum is impracticable. *Brea v. McGlashan*, 3 Cal. App. 2d 454, 460 (1934) ("[a] cause of action for an accounting requires a showing that a relationship exists between the plaintiff and defendant that requires an accounting, and that some balance is due the plaintiff that can only be ascertained by an accounting"); *see Teselle v. McLoughlin*, 173 Cal. App. 4th 156, 179 (2009). "An action for accounting is not available where the plaintiff alleges the right to recover a sum certain or a sum that can be made certain by calculation." *Teselle*, 173 Cal. App. 4th at 179.

While Plaintiff does not allege that Defendants owed him a fiduciary duty, he argues that Wells owes him fees and penalties received upon the sale of the Subject Property which are too difficult to calculate without an accounting. (ECF No. 1-1 at 47, ¶ 142.) Plaintiff asserts that his equitable accounting claim was never tied to the improper securitization theory as this Court originally discussed in its first Order. (ECF No. 18 at 5.) Plaintiff alleged no facts to support a claim that Defendants owe any amount under an accounting claim because there is a lack of a fiduciary duty, and there are no difficult calculations to be made in this case. However, the Court believes this issue is intertwined with Plaintiff's breach of contract and unfair competition causes of action. "Generally, under the common law, an accounting of the defendant's wrongful profits is available for unfair competition when the defendant intended to cause consumer confusion." *Los Defensores, Inc. v. Gomez*, 223 Cal. App. 4th 377, 401 (2014); *see* Restatement (Third) of Unfair Competition § 37(1)(a) (1995). Due to Plaintiff's surviving claims for breach of contract and unfair competition, the payments made to Defendants that allegedly resulted in wrongful profits constitute an element of Plaintiff's damages. Accordingly, the Court concludes that Plaintiff does not have a cause of action under equitable accounting, but that this Court may require an accounting in assessing damages should Plaintiff prevail.

Therefore, Defendants' Motion to Dismiss Plaintiff's Tenth Cause of Action is GRANTED.

//

### IV. CONCLUSION

For the reasons set forth above, the Court hereby GRANTS Defendants' Motion to Dismiss Plaintiff's Complaint as to Counts VI, VII, and X.  (ECF No. 4.)

IT IS SO ORDERED

Dated: June 13, 2016

                                               Troy L. Nunley
                                               United States District Judge